THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TRAMEL FOREMAN, Defendant-Appellant.

First District (4th Division)   No. 1—04—1362

Opinion filed September 22, 2005.

Michael J. Pelletier and Joshua A. Tepfer, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Campos, Amy Watroba Kerns, Carol Gaines, and Melissa Samp, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant Tramel Foreman was found guilty of first degree murder. The jury additionally found that during the commission of the offense, defendant personally discharged a firearm that proximately caused the victim Larry Lowery's death. The trial court sentenced defendant to two concurrent 50-year prison terms for two counts of first degree murder. On appeal, defendant contends (1) that his trial counsel was ineffective in failing to question potential jurors concerning their understanding of the principles set out in *People v. Zehr*, 103 Ill. 2d 472 (1984), and Supreme Court Rule 431(b) (177 Ill. 2d R. 431(b)); (2) that the trial court's supplemental instructions to the deadlocked jury were coercive; (3) that section 5—8—1(a)(1)(d)(iii) of the Unified Code of Corrections (the Code) (730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2002)) (hereinafter referred to as the firearm enhancement provision), which provides that an additional term of 25 years to life shall be added to a defendant's sentence if, during the commission of his or her crime, he or she discharged a firearm which caused the death of another, should be interpreted as applying only when the discharge of a firearm causes the death of someone other than the victim; (4) that the firearm enhancement provision is unconstitutional because it allows for additional punishment for an inherent element of the original offense of murder; (5) that the firearm enhancement provision is unconstitutional because it does not bear a reasonable relationship to the public interest it seeks to protect; (6) that defendant was erroneously sentenced for two

counts of first degree murder in violation of the one-act, one-crime doctrine; (7) that defendant is entitled to an additional day of credit against his sentence; and (8) that the trial court violated supreme court Rule 431 (a) (177 Ill. 2d R. 431(a)) in failing to inform potential jurors of the principles set out in *Zehr* and Rule 431(b).

Defendant was indicted on 12 counts of first degree murder. The case proceeded to trial on counts IX and X. Count IX alleged that defendant, without lawful justification, intentionally or knowingly shot and killed the victim with a firearm and during the commission of the offense personally discharged the firearm that proximately caused the victim's death. Count X alleged that defendant, without lawful justification, shot and killed the victim with a firearm, knowing that such shooting created a strong probability of death or great bodily harm to the victim, and during the commission of the offense personally discharged the firearm that proximately caused the victim's death.

During jury selection, on at least two occasions, the trial court asked the potential jurors, as a group, if each of them could sign a guilty verdict form if the State were to meet its burden of demonstrating defendant's guilt beyond a reasonable doubt. The court further asked the potential jurors, as a group, if each of them could sign a not-guilty form if the State did not meet its burden of demonstrating defendant's guilt beyond a reasonable doubt. The court individually questioned several jurors who expressed doubt in their ability to do either the former or the latter. In questioning one potential juror who expressed doubt in her ability to sign a not-guilty verdict form, the court asked the juror "Do you understand that [defendant is] presumed innocent of the charges?" The court questioned each member of the venire regarding the member's occupation and place of residence. The court further inquired of each member whether he or she had previously been a member of a jury, whether he or she had been or whether a close friend or family member had been the victim of a crime, and whether he or she had ever been involved in a lawsuit. Though they were given an opportunity to ask the venire members questions, both the State's Attorney and defense counsel declined. Defense counsel struck three venire members. After empaneling the jury, the trial court informed its members that, "[w]hen the State has completed their evidence, the defense may proceed should they choose to do so, again bearing in mind they don't have a burden to present evidence."

At trial, Lance Davis, the victim's cousin, testified that at 11:15 p.m. on September 26, 2001, he drove to the intersection of 49th and Michigan and parked at a church on the corner. Lance got out of his car and walked toward several men who were engaged in a physical

fight across the street. As he was walking toward the fight, Lance noticed defendant sitting in the driver's seat of a tan station wagon parked down the street. When Lance reached the fighting men, he joined the fight. Lance testified that defendant then drove to the location of the fight and yelled to Kevin Davis, one of the participants in the fight, to get into the car. Kevin got into the backseat of the car on the passenger side. A passenger in the front seat then leaned back in the seat as defendant reached across the passenger and fired a gun two or three times out of the passenger-side front window. Defendant then drove away toward 49th Street and Wabash. At the police station in the early morning of September 27, 2001, Lance identified photographs of Kevin and defendant.

Kevin, defendant's cousin, testified that on the evening of September 26, 2001, he drove to 49th and Michigan to visit his girlfriend. As Kevin was walking down the street, several men, including Lance, attacked Kevin and began to beat him. As he was being beaten, defendant drove up to the fight in his tan station wagon. Defendant's girlfriend was sitting in the front seat of the car, but at trial, Kevin could not recall whether another passenger was also in the car. Kevin got into his cousin's car through the back passenger-side door. As he was getting into the car, Kevin testified, he heard shots being fired behind him. Kevin testified that defendant had not fired the shots. At trial, Kevin admitted that he spoke with police officers following the shooting but did not recall telling the police that he saw defendant's girlfriend, who was in the front passenger seat of the car, lean back and defendant fire a gun at the fighting men or that, as they drove away, defendant had said that he had "let out a couple of shots off and that [defendant] got at least one" of the fighting men.

Detective Michael Rose was assigned to the shooting in the early morning of September 27, 2001. Rose testified that he interviewed Kevin, who stated that, after he dove into the backseat of defendant's car, defendant's girlfriend, who was in the passenger seat of the car, leaned back and defendant raised his right arm and fired three or four shots from a black handgun out of the front passenger window. Kevin told Rose that, as they were driving away from the scene, defendant told him that he had let off a couple of shots and that he "got at least one" of the fighting men.

The victim's cousin, Gregory Curtis, testified that when he arrived at 49th and Michigan on September 26, 2001, the fight was already in progress. Curtis testified that he had known defendant for 10 years. Curtis, who did not join the fight, had watched defendant drive to the scene of the fight. Curtis testified that Kevin got into the backseat of

the passenger side of defendant's car. Defendant's girlfriend was in the front passenger seat of the car while a woman named Sharon was in the backseat. After Kevin entered the car, Curtis saw defendant's girlfriend lean back and heard two or three gunshots. Curtis and the other men dove to the ground. After defendant drove away toward Wabash, the men realized that the victim had been shot.

James Shader, a police officer employed by the forensic services division of the Chicago police department, was assigned to the shooting in the early morning of September 27, 2001. Shader first reported to Cook County Hospital, where the victim had been taken, and learned that the victim had died. Shader proceeded to the crime scene, where he was unable to find a gun or shell casings.

Dr. Scott Denton, a forensic pathologist and deputy medical examiner, testified that the cause of the victim's death was a gunshot wound to the chest.

After the State presented its case-in-chief, the defense rested without calling any witnesses. The trial court instructed the jury that defendant had been charged with first degree murder and that the State had additionally alleged that defendant had personally discharged a firearm that proximately caused the victim's death. The court further instructed the jury:

> "The defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict [and] is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that he is guilty. The State has the burden of proving the defendant guilty beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence. The fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict."

After several hours of deliberation, the jury indicated to the court that it was deadlocked. The court instructed the jury to continue deliberating. Shortly thereafter, the jury again indicated that it was deadlocked and that one juror had expressed an unwillingness to sign a guilty verdict form under any circumstances because of her religious beliefs. The trial court admonished the jury that it was not being asked to judge the defendant but to rule on the facts of the case. An hour later, the jury returned a guilty verdict and found that the State had proven that during the commission of the offense defendant had personally discharged a firearm that proximately caused the victim's death.

Defendant's motion for a new trial, in which he alleged that he

had not been proven guilty beyond a reasonable doubt, and supplement to his motion for new trial, in which he alleged that the firearm enhancement provision was unconstitutional, were denied. After considering arguments in aggravation and mitigation, the court sentenced defendant to a term of 50 years in prison on count IX and a second term of 50 years in prison on count X and ordered that the terms be served concurrently.

We will first address defendant's related first and final contentions. Defendant first contends that his trial counsel was ineffective in failing to question potential jurors during *voir dire* concerning the principles articulated in *Zehr* and Rule 431(b). The State replies that, having failed to object to counsel's performance at trial or in a post-trial motion, defendant has waived this contention. The State further contends that defendant was not prejudiced by counsel's failure and that any error was cured by the instructions given to the jury prior to deliberation.

■ Regarding the State's claim that this contention is waived, we note that "[a]n attorney cannot be expected to argue his own ineffectiveness. That is why, for example, trial counsel's failure to assert his own ineffective representation in a posttrial motion does not waive the issue on appeal." *People v. Lawton*, 212 Ill. 2d 285, 296 (2004), citing *People v. Parker*, 288 Ill. App. 3d 417, 421 (1997). Accordingly, we find that defendant has not waived the issue of ineffective assistance on review.

■ A defendant alleging ineffective assistance of trial counsel must demonstrate that counsel's representation was objectively unreasonable and that but for counsel's errors, there was a reasonable probability that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 695, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068-69 (1984). A failure to satisfy either prong of the test articulated above precludes a finding of ineffective assistance. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

■ In support of his contention that trial counsel was ineffective, defendant relies on *Zehr*, in which the supreme court held that the trial court abused its discretion in refusing defense counsel's request, during *voir dire*, to ask the potential jurors questions concerning the State's burden of proof, the right of the defendant not to testify and the presumption of innocence. The court stated:

"We are of the opinion that essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held

against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of trial will have little curative effect." *Zehr*, 103 Ill. 2d at 477.

In 1997, the supreme court amended Rule 431 to ensure compliance with the requirements of *Zehr*. 177 Ill. 2d R. 431, Committee Comments. Following the amendment, Rule 431(b) requires that, if requested by the defendant, the court shall ask the potential jurors, individually or as a group, whether they understand the *Zehr* principles. 177 Ill. 2d R. 431(b).

In this case, we cannot say that trial counsel was ineffective in failing to question potential jurors regarding the principles articulated in *Zehr*. This case was not closely balanced. Lance and Curtis each testified that on the evening of September 26, 2001, defendant drove to the scene of the fight, Kevin got into the backseat of defendant's car and the front-seat passenger leaned back while defendant fired shots into the crowd of fighters. While Kevin testified at trial that defendant had not fired shots at the crowd, Officer Rose testified that when he initially interviewed Kevin, Kevin's account of the incident was consistent with Lance's and Curtis' accounts. Kevin told Rose that defendant had driven up to the fight, Kevin had gotten into defendant's backseat, defendant's girlfriend, who was in the front passenger seat, had leaned back and defendant had reached over her and fired shots into the crowd. While Officer Rose's testimony was not substantive evidence, it did impeach Kevin's testimony. Because of the overwhelming evidence of defendant's guilt, defendant cannot show a reasonable probability that the outcome of the case would have been different had counsel questioned the potential jurors regarding the *Zehr* principles. Accordingly, defendant's contention of ineffective assistance is without merit.

Defendant cites *People v. Pearson*, 356 Ill. App. 3d 390 (2005), in support of his next contention that the trial court violated Supreme Court Rule 431(a) (177 Ill. 2d R. 431(a)) in failing to inform potential jurors of the *Zehr* principles during *voir dire*. The State responds that *Pearson* wrongly interpreted Rule 431(a) and asks that we decline to follow it.

We note, preliminarily, that construction of supreme court rules is comparable to construction of statutes. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 332 (2002). "As is the case with statutes, our primary task in construing a rule is to ascertain and give effect to the intent of its drafters. [Citation.] 'The most reliable indicator of intent is the language used, which should be given its plain and ordinary meaning.' " *Robidoux*, 201 Ill. 2d at 332, quoting *In re Estate of Rennick*, 181 Ill. 2d 395, 405 (1998). We will read a rule as a whole and construe

it so that no part of it is rendered meaningless or superfluous. See *People v. Jones*, 214 Ill. 2d 187, 193 (2005) (construing a statute).

We begin our analysis with a discussion of the history of Rule 431. As discussed above, in *Zehr*, the supreme court held that a trial court could not deny a defendant's request to question the members of a jury venire concerning the principles that a defendant is presumed innocent, that the State bears the burden of proving a defendant guilty and that a defendant is not required to present evidence and will not be penalized for declining to testify. Prior to 1997, Rule 431 provided that, "In criminal cases, the *voir dire* examination of jurors shall be conducted in accordance with Rule 234." 134 Ill. 2d R. 431. Rule 234 provided, in relevant part, that trial judges "may" acquaint prospective jurors with their general duties and responsibilities. 134 Ill. 2d R. 234. In 1997, the supreme court amended Rule 431 in order "to ensure compliance with the requirements of [*Zehr*]" and to "end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." 177 Ill. 2d R. 431, Committee Comments. Accordingly, Rule 431 was amended to provide, in relevant part:

"(a) *** The court shall acquaint prospective jurors with the general duties and responsibilities of jurors.

(b) If requested by the defendant, the court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects." 177 Ill. 2d R. 431.

In *Pearson*, "[a]ll of Supreme Court Rule 431 [citation] [was] on the table." *Pearson*, 356 Ill. App. 3d at 399. During jury selection the trial court questioned the potential jurors concerning the State's burden of proof beyond a reasonable doubt but did not inform the jurors of, or question them concerning, the principles that the defendant was presumed innocent, that he had no duty to present evidence and that he could not be penalized for failing to testify. Defense counsel did not ask that the court inquire into the potential jurors' understanding of those principles. The court instructed the jury with regard to the omitted principles prior to deliberation. On appeal, the defendant first contended that he was deprived of a fair trial

when the trial court failed to ask the potential jurors the questions contained in Rule 431(b). In construing the rule, the *Pearson* court found that "[t]he rule does not require the trial court to ask the questions unless they are requested by defense counsel. Failing to ask the questions, standing alone, was not error." *Pearson*, 356 Ill. App. 3d at 397. The defendant next contended that his trial counsel was ineffective for failing to request that the court ask the questions contained in Rule 431(b). The court found that, while there was no strategic reason for defense counsel's failure to request the questions, given the overwhelming weight of the defendant's guilt, the court could not say that the defendant was prejudiced by trial counsel's failure. Accordingly, the *Pearson* court rejected the defendant's first and second contentions.

The *Pearson* court next addressed the question at issue in this case: whether the trial court failed to comply with the last sentence of Rule 431(a), which provides that the trial court shall acquaint prospective jurors with their general duties and responsibilities. In examining the history of Rule 431(a), the appellate court concluded that the 1997 change in the language of the rule from "may" to "shall" indicated that the requirement was mandatory. The court went on to construe what was meant by the requirement that the trial court acquaint prospective jurors with their duties and responsibilities. The court noted that the general practice of trial courts is to discuss the presumption of innocence with potential jurors prior to the commencement of jury selection. The court further cited several cases in which the trial court's preselection comments to jurors regarding the *Zehr* principles excused its failure to strictly comply with the requirement that, upon request, it question the potential jurors regarding their understanding of the principles (see, *e.g.*, *People v. Emerson*, 122 Ill. 2d 411 (1987)) and a case in which the trial court's failure to instruct the jury prior to deliberation on the presumption of innocence was excused by its discussion, prior to *voir dire*, of the presumption (see *People v. Casillas*, 195 Ill. 2d 461 (2000)). Though the *Pearson* court acknowledged that it had "found no criminal case directly addressing the last sentence of Rule 431(a)," it quoted *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 35 (1989), in which the court found that the trial court's statements concerning the difference between the standards of proof required in civil and criminal cases " 'were intended to serve' the purpose of the last sentence in Rule 234—the civil counterpart to Rule 431." *Pearson*, 356 Ill. App. 3d at 400. Accordingly, the *Pearson* court concluded that "Rule 431(a) requires trial judges to inform prospective jurors about a defendant's basic rights, as set out in Rule 431(b), so that they will be informed

about their 'general duties and responsibilities.' " *Pearson*, 356 Ill. App. 3d at 400, quoting 177 Ill. 2d R. 431(a). The court found that the trial court's failure to so inform the potential jurors was error.

Finally, noting that the defendant had waived an objection to the trial court's noncompliance with Rule 431(a), the *Pearson* court sought to determine whether the trial court's error was reversible. The court began by noting the high "significance and value we give the rights the trial court did not discuss and the prospective jurors did not hear." *Pearson*, 356 Ill. App. 3d at 401. The court further noted that attitudinal studies and case law demonstrate that, with regard to the principle that a defendant is presumed innocent, " ' "a substantial proportion of persons eligible for jury service:—agree that a person who is brought to trial is probably guilty." ' " *Pearson*, 356 Ill. App. 3d at 401, quoting M. Toomin, *Jury Selection in Criminal Cases: Illinois Supreme Court Rule 431—A Journey Back to the Future and What It Portends*, 48 De-Paul L. Rev. 83, 101 n.142 (1998), quoting 1 E. Krauss & B. Bonora, Jurywork § 2.04(2)(a) (1997). Accordingly, the court reversed the defendant's conviction, finding that the trial court's failure to inform the potential jurors of the principles articulated in Rule 431(b), as required by Rule 431(a), was an error " 'of such gravity that it threatens the very integrity of the judicial process.' " *Pearson*, 356 Ill. App. 3d at 402, quoting *People v. Blue*, 189 Ill. 2d 99, 138 (2000).

We disagree with the *Pearson* court's construction of Rule 431. First, we will address the specific language of Rule 431. We agree with *Pearson* that the change in the language of Rule 431(a) from "may" to "shall" certainly indicates that subsequent to the amendment a trial court is required to "acquaint prospective jurors with the general duties and responsibilities of jurors." 177 Ill. 2d R. 431(a). Nonetheless, we disagree with the *Pearson* court with regard to what exactly the language of Rule 431(a) requires of the court. When Rule 431 is read as a whole, the *Pearson* court's construction of subsection (a) would render subsection (b) of the rule superfluous. We cannot agree with the *Pearson* court that the supreme court would, in subsection (b), leave it to defense counsel to decide whether the trial court should inquire into the jurors' understanding of the *Zehr* principles but would, in subsection (a), make the trial court's failure to inform the jurors of those principles reversible error, even absent a request by defense counsel. Defendant suggests that the *Pearson* court's interpretation of subsection (a) is not inconsistent with subsection (b) because, while subsection (a) requires a court to generally inform potential jurors of the principles, subsection (b) allows defense counsel to request the court to specifically inquire into the potential jurors' understanding of the principles. We cannot agree with such an

interpretation. Had the supreme court intended to require the trial court to generally inform potential jurors of the principles articulated in subsection (b), it would have explicitly listed those principles in subsection (a), as it did in subsection (b), or combined subsections (a) and (b) to require the trial court to inform potential jurors of those principles and to further specifically inquire into their understanding of the principles if requested by defense counsel. Instead, the supreme court generally provided in subsection (a) only that the trial court is required to acquaint jurors with their duties and responsibilities.

■ Moreover, we acknowledge that it has been held to be reversible error for the trial court to fail to permit inquiry to test the prospective jury for prejudice and bias because it thwarts the selection of an impartial jury and an "instruction at the end of the trial [would] have little curative effect." *Zehr*, 103 Ill. 2d at 477. However, it is not reversible error to fail to acquaint the prospective jurors with their basic duties and responsibilities during *voir dire* under Rule 431(a) if that knowledge is ultimately imparted to the jury as required by the Illinois Pattern Jury Instructions, Criminal (4th ed. 2000) (IPI) at the conclusion of trial. For example, the committee note to IPI Criminal 4th No. 2.03 makes it mandatory that all juries are to be instructed on the presumption of innocence and the standard and general burdens of proof, and if *requested by a defendant*, an appropriate jury instruction may be given that his failure to testify cannot be held against him. (Emphasis added.) See IPI Criminal 4th No. 2.04. Accordingly, contrary to the analysis in *Pearson*, there can be no prejudice in the latter case when the requisite knowledge has ultimately been imparted to the jurors consistent with the purpose of Rule 431(a).

Further supporting our conclusion that Rule 431(a) does not require a trial court to inform potential jurors of the principles set out in Rule 431(b) absent a request by defendant is a comment by Judge Michael Toomin, a member of Illinois Supreme Court Rules Subcommittee who participated in the drafting of portions of the 1997 amendment to the rule. In discussing the amendment, Judge Toomin first analyzes the changes to subsection (a). He writes of the change to the final sentence of subsection (a):

> "Lastly, the court is directed to acquaint prospective jurors with their general duties and responsibilities. This last grant of authority was given in 1983, and although *the rule provides no guidance to judges in fulfilling this requirement*, it does not represent a significant change." (Emphasis added.) 48 DePaul L. Rev. at 92.

Judge Toomin goes on to discuss the addition of subsection (b). Of the addition, Judge Toomin writes, "This provision is new and is intended to ensure compliance with the requirements of *Zehr*." 48 DePaul L.

Rev. at 92. Judge Toomin further notes that both the Criminal Rules Subcommittee and the Rules Committee recommended that the rule mandate the trial court to ask each potential juror the pertinent *Zehr* inquiries. "The Supreme Court, however, modified the proposal with the result that the rule is permissive; the *Zehr* questions are required only where they are requested by the defense." 48 DePaul L. Rev. at 93.

We interpret Judge Toomin's comments to mean that the drafters of the rule intended subsection (b) to bring trial courts into compliance with *Zehr* and that subsection (a) was not amended to serve such a purpose. Furthermore, it is reasonable to conclude from the comments that, contrary to the holding in *Pearson*, subsection (b) does not offer guidance as to what is required by subsection (a). The supreme court's refusal to make the requirements of subsection (b) mandatory further indicates that the court did not intend the result reached in *Pearson*.

Our conclusion is implicitly supported by *People v. Benford*, 349 Ill. App. 3d 721 (2004), and *People v. Gregg*, 315 Ill. App. 3d 59 (2000). In *Benford*, during jury selection, the court informed the potential jurors that the defendant was presumed innocent, that the defendant was not required to present evidence and that the State bore the burden of proving the defendant's guilt beyond a reasonable doubt. During jury selection, neither the court nor defense counsel informed or questioned the jury regarding the principle that defendant's failure to testify could not be used against him; however, prior to deliberations the trial court instructed the jury that in reaching its verdict, the fact that the defendant did not testify should not be considered. On appeal, the defendant contended that his counsel had been ineffective in failing to request that the trial court inquire into whether the potential jurors understood the principles set out in Rule 431(b). The court noted that, under Rule 431(b) and *Zehr*, a defendant's decision to question the jurors concerning their understanding of the principles is optional. Regarding the trial court's failure to inform the potential jurors of the defendant's right not to testify and trial counsel's failure to request that the court so inform the jurors, the *Benford* court held that "the jury was made aware of this principle just prior to deliberating, thereby curing any error." *Benford*, 349 Ill. App. 3d at 733. The court generally held that "the *voir dire* as conducted did not deprive defendant of a fair trial and does not evince ineffective assistance of counsel." *Benford*, 349 Ill. App. 3d at 733. While we acknowledge that the defendant in *Benford* did not contend that the trial court erred in failing to inform the potential jurors of defendant's right not to testify, we find the fact that the court held that the defendant was not deprived of a fair trial supportive of our holding.

In *Gregg*, the defendant raised an insanity affirmative defense. During *voir dire*, defense counsel asked that the trial court inform the jury of defendant's burden of proof for an insanity defense. The trial court denied the request. The *Gregg* court held that Rule 431(b) and *Zehr* mandate that a trial court honor such a request. However, the court further stated:

> "We limit our decision to require that prospective jurors on *voir dire* be informed of the defendant's burden of proof and standard of proof imposed by law when the insanity defense is raised and we limit that requirement to insanity cases where defense counsel requests that prospective jurors be so informed." *Gregg*, 315 Ill. App. 3d at 73.

In limiting its holding, the *Gregg* court refused to require that, in cases in which an insanity defense is raised, a trial court must admonish potential jurors of the defendant's burden when such an admonishment is not specifically requested by the defendant.

Furthermore, in *Casillas*, a case cited by the *Pearson* majority, the supreme court held that the trial court's admonishments about the presumption of innocence during jury selection erased any prejudice caused by the trial court's subsequent failure to give a presumption-of-innocence instruction at the close of the case. We agree with Justice Garcia's comment, in dissent to the *Pearson* decision, that *Casillas* "may also be read as authority that, in a case such as this, where the trial court informed the prospective jurors of the State's burden and, thus, impliedly, the lack of any burden on the defendant, and where the jury was properly instructed at the conclusion of the trial, reversal is unwarranted without a showing of prejudice." *Pearson*, 356 Ill. App. 3d at 403 (Garcia, J., dissenting).

■ Turning to the case at bar, we first note that defendant has waived this argument because he failed to raise an objection to the court's failure to inform potential jurors of the principles embodied in Rule 431(b) at trial or in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Nonetheless, we find that, waiver aside, the jurors were substantially informed in accordance with Rule 431(a) prior to the commencement of trial and that defendant was not deprived of a fair trial. During jury selection, the potential jurors were asked, as a group, whether they could sign a guilty verdict form if the State met its burden of proof beyond a reasonable doubt and whether they could sign a not-guilty form if the State did not meet its burden. Potential jurors expressing doubt in their ability to sign either form were individually questioned by the court. Prior to the commencement of trial, the jury was informed that the defense was not required to present any evidence. Prior to deliberation, the court additionally

informed the jury of the presumption of defendant's innocence. We find that, though the trial court could have done more to inform the potential jurors of their "general duties and responsibilities" (177 Ill. 2d R. 431(a)), the trial court's comments and questions met the minimum required by Rule 431(a). Furthermore, though the potential jurors may not have been informed of all of the *Zehr* principles during jury selection, prior to deliberation, the jury *was* informed of all of the principles. Accordingly, absent a showing of prejudice, we refuse to overturn defendant's conviction on this ground.

■ Defendant next contends that the trial court's admonishment to the deadlocked jury improperly coerced the holdout juror and that, accordingly, "this court cannot have confidence that this verdict is unanimous." The State replies that defendant has waived this contention on appeal because he neither objected to the admonishment at trial, moved for a mistrial nor raised this contention of error in his posttrial motion (see *Enoch*, 122 Ill. 2d at 187), and that, waiver aside, the trial court's comments were not coercive. While defendant acknowledges that the issue is waived, he asks that we review his contention, nonetheless, pursuant to the plain error doctrine.

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615. The Illinois Supreme Court has held that the plain error rule may be invoked when "(1) the evidence in a criminal case is closely balanced or (2) the error is so fundamental and of such magnitude that the accused is denied the right to a fair trial and remedying the error is necessary to preserve the integrity of the judicial process." *People v. Johnson*, 208 Ill. 2d 53, 64 (2003); *People v. Herron*, 215 Ill. 2d 167, 186 (2005) (denying the State's request that the court abandon the above-articulated disjunctive test in favor of the four-part test outlined in *United States v. Olano*, 507 U.S. 725, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993), and finding that "the federal and state plain-error tests are neither 'diametrically opposed' nor 'fundamentally divergent' ").

> "Our supreme court in *People v. Childs*[, 159 Ill. 2d 217 (1994)], set forth specific guidelines with respect to communications with a deliberating jury. In that regard the court held that the trial court had discretion to decline to answer inquiries from the jury when the instructions are readily understandable and sufficiently explain the relevant law; when further instructions would serve no useful purpose or would potentially mislead the jury; when the jury's inquiry involves a question of fact; or when the giving of an answer would cause the court to express an opinion that would likely direct a verdict one way or another. ***

When the jury communicates to the court its inability to reach a unanimous verdict, the court may, in its discretion, proffer some guidance, including the giving of a supplemental instruction such as the [*People v. Prim*, 53 Ill. 2d 62 (1972),] instruction." *People v. Lee*, 303 Ill. App. 3d 356, 362-63 (1999).

Such instructions should be simple, neutral and noncoercive and should avoid implying that the majority view is the correct one. *People v. Gregory*, 184 Ill. App. 3d 676, 681 (1989). The test for reviewing the propriety of a trial court's instructions to a deadlocked jury is whether, considering the totality of the circumstances, the language used by the court actually coerced or interfered with the jury's deliberations to the prejudice of the defendant. *Gregory*, 184 Ill. App. 3d at 681. In considering the totality of the circumstances, while the length of the jury's deliberations subsequent to the court's supplemental instructions, alone, is not conclusive as to whether the verdict was coerced (*Gregory*, 184 Ill. App. 3d at 682), a long period of time can indicate that the jurors were not improperly influenced by the court's comments (see *People v. Eppinger*, 293 Ill. App. 3d 306, 312 (1997)).

In support of his contention, defendant analogizes the facts of this case to those of *People v. Branch*, 123 Ill. App. 3d 245 (1984). In *Branch*, after 4½ hours of deliberation, the jury sent a note to the court which indicated that, having thoroughly discussed the case, " 'one person who has consistently voted not guilty had indicated to us that they could not vote guilty because they do not want anyone to go to jail.' " *Branch*, 123 Ill. App. 3d at 250.

"Without showing the note to counsel or apprising them of its substance, the trial judge summoned the jury into the courtroom and said:

'Ladies and gentlemen of the jury, I have your note and it seems from the note that you are faced with a dilemma. The person on your jury indicated in this note evidently should not have received jury service.'

The court then gave them a deadlock instruction and concluded by saying:

'[N]ow, we will give the jury all the time that it needs. In about an hour we will arrange overnight accommodations and perhaps tomorrow. We won't cut this jury short because of the dilemma it seems to indicate or the impasse that has been caused.' " *Branch*, 123 Ill. App. 3d at 250.

Thereafter, the jury deliberated for 10 additional minutes and returned a verdict of guilty. On appeal, the defendant contended that the trial court's instructions to the deadlocked jury were coercive. The *Branch* court agreed with the defendant that the comments warranted reversal. The court noted that the remarks "had the effect of

intimidating the juror into changing his vote by implying that his refusal to defer to the majority position somehow should have disqualified him from jury service." *Branch*, 123 Ill. App. 3d at 251-52. The court further found that "the possibility of overnight sequestration only reinforced that pressure by insinuating that the juror had already created a problem, and that if he failed to alter his position within one hour he would be responsible for further inconvenience to himself and his fellow jurors." *Branch*, 123 Ill. App. 3d at 252. Finally, the court noted that, while brief deliberations are not conclusive in determining whether the court's comments were coercive, the jury's 10-minute deliberation did invite such an inference.

Here, after 2½ hours of deliberation, the jury sent a note to the court indicating that one of its members was unable to sign the guilty verdict form even if she believed that defendant was guilty. With defense counsel's express consent, the trial court sent the jury a note directing it to continue deliberating. Approximately half an hour thereafter, the jury sent another note, indicating that one juror objected to returning a verdict under any circumstances because of religious beliefs. The trial court summoned defendant and defense counsel, admonished them of the contents of the note and informed them that she intended to instruct the jury that it was not being asked to render judgment on anyone. Defendant did not object. The court admonished the entire jury:

> "I will inform all of you as I did during jury selection that no one, no one seated in that jury box is being asked to pass judgment upon anyone. I do not believe anyone can pass judgment upon anyone. You have been called down as jurors to judge the facts of the case based on the evidence that you heard in this courtroom and the exhibits which you have received. So if anybody thinks that they are being asked to judge someone they are mistaken."

Approximately an hour later, the jury returned a guilty verdict.

At the outset, we note that in *Prim*, the supreme court formulated a model supplemental jury instruction to be administered to deadlocked juries. The *Prim* instruction provides, in part, " 'You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.' " *Prim*, 53 Ill. 2d at 76. In this case, the trial court's instruction to the jury was a modification and clarification of the above-quoted portion of the *Prim* instruction and was a correct statement of the law. Furthermore, we find this case distinguishable from *Branch* and find that the trial court's comments did not rise to the level of plain error. While in *Branch* the trial court's comments served to intimidate and belittle the holdout juror into conforming with the opinion of the other members, here, the court's

comments clarified and instructed the holdout juror on her duties and responsibilities as a juror. Moreover, in *Branch*, the court's finding that reversal was warranted was based in part on the trial court's threat that the jury would be sequestered if it did not reach a unanimous verdict within an hour. No such threat was made here. Finally, in *Branch*, the jury returned its guilty verdict just 10 minutes after receiving supplemental instructions. On the contrary, in this case, the jury deliberated for a full hour before returning its verdict of guilty. Under the totality of the circumstances, we cannot say that any error committed by the trial court was of such magnitude that defendant was deprived of a fair trial. Notably, as discussed above, the facts of this case were also not close. Accordingly, we find that the contended error does not rise to the level of plain error and is not grounds for reversal.

■ Defendant's next three contentions of error pertain to the firearm enhancement provision of the Code. The firearm enhancement provision provides:

"(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

\* \* \*

(d)

\* \* \*

(iii) if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2002).

■ Defendant first contends that this court should interpret the "another person" language of the firearm enhancement provision to mean that defendant's sentence should be enhanced only if his actions cause bodily harm, permanent disability, permanent disfigurement or death to a person *other than* the first-degree-murder victim. Defendant argues that the plain language of the provision requires such a construction and that, alternatively, should this court conclude that the language is ambiguous, the legislative history requires such a construction. Defendant further contends that acceptance of his proposed interpretation would eliminate any constitutional doubt in the statute. Defendant next contends that the "causing death" requirement of the firearm enhancement provision allows for improper

double enhancement because it allows for additional punishment for the death of the victim, an element inherent in the offense of first degree murder. Put another way, defendant argues that the single factor of a victim's death serves both as an element of the underlying crime of murder and as a factor allowing for the imposition of an enhanced sentence. Finally, defendant contends that the firearm enhancement provision is unconstitutional because it does not bear a reasonable relationship to the public interest it seeks to protect and violates both due process of law and the proportionate penalties clause. Specifically, defendant argues that the Code punishes the means of committing the crime of murder more harshly than it punishes the crime of murder itself because section 5—8—1(a)(1)(a) of the Code (730 ILCS 5/5—8—1(a)(1)(a) (West 2002)) prescribes a sentencing range of 20 to 60 years for first degree murder and the firearm enhancement provision adds an additional 25 years to life to the sentence when the murder is committed with a firearm.

This court has repeatedly rejected defendant's contentions. See *People v. Thompson*, 354 Ill. App. 3d 579 (2004) (holding that "another person" refers to all persons other than the defendant, that the provision does not violate the prohibition against double enhancement and that the provision does not violate the constitutional due process and proportionate penalties clauses); *People v. Tolbert*, 354 Ill. App. 3d 94 (2004) (same); *People v. Bloomingburg*, 346 Ill. App. 3d 308 (2004) (holding that the provision violates neither the proportionate penalties clause nor the prohibition against double enhancement); *People v. Sawczenko-Dub*, 345 Ill. App. 3d 522 (2003) (holding that the provision does not violate the proportionate penalties clause, separation of powers principles or double jeopardy principles and does not create impermissible double enhancement); accord *People v. Moore*, 343 Ill. App. 3d 331 (2003) (Second District) (holding that the provision does not violate the proportionate penalties clause or create impermissible double enhancement). Most recently, each of defendant's contentions regarding section 5—8—1(a)(1)(d)(iii) of the Code was rejected in *People v. Jones*, 357 Ill. App. 3d 684 (2005). In *Jones*, the defendant first contended, as defendant does here, that "the phrase 'another person' found in the 25-year-to-natural-life enhancement provision contained in section 5—8—1(a)(1)(d)(iii) of [the Code] should be interpreted to apply only in cases where the basis for the enhancement is not the murder victim's death." *Jones*, 357 Ill. App. 3d at 687, quoting 730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2000). After conducting a thorough analysis of the statutory language, the *Jones* court rejected the defendant's contention, holding:

"We believe the use of the phrase 'another person' is unambiguous

when interpreted in context of the entire statute. It is intended to cover victims and bystanders. Because there is no real ambiguity here, we are not required, as the defendant suggests, to resort to extrinsic aids for construction or to construe the language in favor of any particular party." *Jones*, 357 Ill. App. 3d at 690.

The defendant in *Jones* also raised the same contentions of double enhancement and proportionate penalties that defendant raises in this case. Regarding the defendant's contention that the firearm enhancement provision amounts to improper double enhancement, the *Jones* court held:

"We find no double enhancement in this case. 'Firearm use is not inherent in the offense of first degree murder.' [Citation.] 'It is when first degree murder is committed by discharging a firearm that the sentence is enhanced. In this respect, the first degree murder sentencing statute reflects the pattern contemporaneously established with regard to several other serious felony offenses, similarly enhancing the punishment for firearm use during the commission of these offenses.' " *Jones*, 357 Ill. App. 3d at 692, quoting *Thompson*, 354 Ill. App. 3d at 592.

Regarding the defendant's contention that the firearm enhancement provision violates due process and the proportionate penalties clause, the *Jones* court, having reviewed relevant case law, held:

"As we have learned from our review of *Sawczenko-Dub, Moore, Bloomingburg* and *Thompson*, 'the purpose underlying the sentencing-enhancing provision at issue is to deter the use of firearms in the commission of murder.' [Citation.] We find no compelling reason to depart from the wisdom of those cases, as that is a legitimate statutory purpose despite the fact that an enhanced sentence can exceed the statutory maximum for the un-enhanced crime. That is the very reason why the legislature has adopted such a hard-line attitude toward the use of firearms to commit murder, to deter and discourage such conduct." *Jones*, 357 Ill. App. 3d at 694, quoting *Thompson*, 354 Ill. App. 3d at 593.

Having considered defendant's arguments and reviewed the relevant case law, we continue to adhere to our holdings in *Jones* and the above-cited cases and similarly reject defendant's contentions of error pertaining to section 5—8—1(a)(1)(d)(iii) of the Code.

■ Defendant next contends that he was erroneously sentenced to two counts of first degree murder in violation of the one-act, one-crime doctrine and asks that we vacate his conviction for murder based on count X, which alleged that, without lawful justification, defendant shot and killed the victim with a firearm, knowing that such shooting created a strong probability of death or great bodily harm. The State agrees that the dual convictions violate the doctrine

and further agrees that the conviction under count X should be vacated while the "intentional and knowing" conviction under count IX should be affirmed.

"A defendant cannot be convicted of more than one murder arising out of the same physical act. [Citation.] When multiple murder convictions have been entered for the same act, the less culpable convictions must be vacated." *People v. Pitsonbarger*, 142 Ill. 2d 353, 377 (1990). We agree with defendant and the State that the two convictions improperly violated the one-act, one-crime doctrine and that count IX, which required a more culpable mental state, should stand. Accordingly, we vacate defendant's conviction under count X.

Defendant further contends that it is unclear from the record whether the trial court took defendant's dual convictions into account in sentencing him and that, therefore, the case must be remanded for resentencing.

Defendant compares the case at bar to *People v. Bone*, 103 Ill. App. 3d 1066 (1982). In *Bone*, the defendant was convicted of intentional murder, felony murder and armed robbery and was sentenced to a 40-year term of imprisonment for murder and a concurrent 20-year term for armed robbery. After determining that the trial court had erred in entering convictions of intentional murder and felony murder in violation of the one-act, one-crime doctrine and vacating the defendant's felony murder conviction, the court addressed the defendant's contention that a new sentencing hearing was warranted. The court explained:

> "Because we are unable to discern to what extent the felony murder conviction may have influenced the trial court in arriving at its sentencing decision, if at all, we vacate the defendant's murder sentence and remand the cause for a new sentencing hearing. [Citations.] The State's argument that this cause need not be remanded for a resentencing hearing in light of the vacatur of one of the defendant's two murder convictions, because the trial judge imposed a single sentence of imprisonment on both convictions, cannot persuade. Great deference is accorded the trial judge in matters of sentencing, and we cannot say with certainty on the basis of the record before us that the trial judge would have imposed the same sentence (40 years) had he entered only one judgment of conviction for murder." *Bone*, 103 Ill. App. 3d at 1069.

In this case, remand for resentencing is not warranted because, unlike in *Bone*, here, the record supports an inference that the judge would have imposed the same sentence without the additional conviction. See *People v. Guajardo*, 262 Ill. App. 3d 747, 772-73 (1994). Defendant was sentenced to allowable 50-year terms for each murder

conviction. There is no indication that the trial judge's determination that defendant should be sentenced to 50 years in prison for count IX would have been affected if defendant had not also been convicted of count X.

■■■ Defendant next contends that he is entitled to an additional day of credit against his 50-year sentence for time spent in custody prior to sentencing. The parties agree that defendant was taken into custody on October 1, 2001, and was sentenced on March 30, 2004. The parties further agree that while a defendant is entitled to credit for each day he or she spends in custody prior to being sentenced, a defendant will not be credited for the day of sentencing in which he is remanded to the Department of Corrections. See *People v. Stewart*, 217 Ill. App. 3d 373, 376-77 (1991). Nonetheless, while defendant contends that he is entitled to 911 days of credit, the State maintains that he is entitled only to 910 days of credit. Our calculations indicate that, because 2004 was a leap year, defendant is, in fact, entitled to 911 days of credit against his sentence.

For the above-stated reasons, we affirm defendant's murder conviction under count IX, vacate his murder conviction under count X and find that defendant is entitled to 911 days of credit against his sentence. We correct the mittimus in accordance with our holding.

Affirmed in part; vacated in part; mittimus corrected.

QUINN, P.J., and THEIS, J., concur.