SIXTH DIVISION
June 6, 2008

No. 1-06-0058

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| | ) | |
| | ) | No. 03 CR 18027 |
| v. | ) | |
| | ) | |
| JAMIE McCARTER, | ) | Honorable |
| | ) | Christopher J. Donnelly, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Defendant Jamie McCarter was convicted of first degree murder after a jury trial and was sentenced to 60 years in prison. On appeal, he raises three issues. First, he contends that he was denied his right to effective assistance of counsel when his trial counsel failed to object to the State's introduction of certain evidence that he argues was inadmissible. Second, he contends that he was denied a fair trial when the trial court allowed the jury to view gruesome photos of the victim's autopsy. Lastly, he argues that the trial court did not give him a proper preliminary inquiry with regard to his *pro se* posttrial motion alleging ineffective assistance of counsel. For the reasons that follow, we remand for further determination with respect to the last issue.

## I. BACKGROUND

On July 20, 2003, defendant was arrested for the murder of Tyree Bias. He was later charged with first degree murder in connection with Bias's death. The State's theory of the case was that defendant and his brother had kidnapped Bias early on the morning of July 8, 2003, and

that defendant fatally shot Bias in the back of the head and then put Bias's feet on the gas pedal of the car he was in, causing the car to crash down into a ravine and catch on fire.

The case proceeded to a jury trial in July 2005. Officer Reilly, a police officer with the Village of Riverdale, testified for the State that around 6 a.m. on July 8, 2003, the police department was notified of a brush fire around the corner of 136th Street and Wentworth. They found a car on fire at the scene, and after the fire had been extinguished, they discovered a body in the driver's seat of the car.

The State also called Vanessa Jackson to testify. Jackson was a district manager for the Chicago Tribune in June 2003, and on the day of Bias's death, she was delivering newspapers in Riverdale at around 6 a.m. Near the corner of 137th Street and Riverdale, she said she saw a dark-colored Chevy Caprice blocking her way with three young men inside. When she stopped at an apartment to drop off papers, she saw that two of the men from the Caprice were now standing outside the vehicle. She continued along her delivery route and later saw them running toward Riverdale Park, one with his hood up, the other with his t-shirt pulled over his head, even though it was warm outside. They disappeared under a viaduct. Around 10 to 15 minutes later she saw them again, this time at a pay phone at the corner of 138th Street and Michigan.

Jackson testified that she did not get a good look at their faces. She viewed two police lineups on July 11, 2008, and she could not positively identify any of the suspects as the people she had seen, but in the second lineup she did point out one man who "kind of resembled" one of the people from that morning. Later in the trial, State witness Sergeant David Dempsey of the Riverdale police department testified during cross-examination that the man Johnson pointed out

was a man named Shedrick Turner.

Lakesha Johnson also testified for the State. She said that she had been Bias's girlfriend for two years and lived with him in Ford Heights. Bias was a member of a gang called the Gangster Disciples, while defendant and his two brothers Brandon McCarter (Brandon) and Ernest McCarter (Ernest) were members of the Four Corner Hustlers gang. Bias and the McCarter brothers were feuding over territory: Bias sold drugs on 16th Street, while the McCarters sold drugs on 15th Street, and in July 2003 Bias was making more money than they were.

On July 5, 2003, Bias was in jail, and Johnson put up money to have him bonded out. She also told the McCarter brothers that Bias was getting out of jail that day. The State then asked her if defendant told her "It is going down" and "It's time for you to get that car," but she denied that he had said any such thing.

The State then sought to admit into evidence two prior statements made by Johnson: (1) a handwritten statement, signed by Johnson, that was recorded by Assistant State's Attorney (ASA) Patrick Enright on July 15, 2003, at the Riverdale police department, and (2) a transcript of a videotaped statement that Johnson had made to ASA Shital Thakkar on July 17, 2003, at the Riverdale police department. The court ruled that both prior statements would be admitted. Defense counsel objected at first, but then withdrew his objection.

Johnson acknowledged making both of the above statements. She said that nobody forced her to speak to the ASAs and that Enright did not threaten her. However, she testified that she had been "under a lot of pressure" from Sergeant Dempsey: "[H]e told me that if I didn't tell

him what was going on, he was going to charge me with the murder and take my children from me." As a result, she said that she had lied when making those statements.

In the video statement, Johnson had said the following: When she told defendant that Bias was bonding out, defendant said, "It's going down. It's time for you to get that car"; and furthermore, "What they mean about it, it was going down, so I can make sure it's clear, is that they was going to rob [Bias]."

Johnson also said in the video statement that on July 7, 2003, the day before Bias's death, she spoke with the McCarter brothers again; Brandon told her that "it was going down tomorrow" and made eye contact with his brothers, who nodded in agreement. She said that she understood this to mean "that they was going to rob [Bias], take his money, his drugs, and if he didn't up it like they wanted him to up it, they was going to kill him." However, on the stand she denied that any such conversations actually happened.

Johnson next testified that on the day of Bias's death, around 5 a.m., Bias left the house to deliver packs of cocaine to 16th Street, as per his usual routine. When Bias returned around half an hour later, she looked out the basement window and saw him; Bias entered the house to get something, then left shortly afterward. She denied seeing him being followed at any point by a purple Monte Carlo with the McCarter brothers inside.

The State then attempted to impeach her with the handwritten statement, in which she gave the following account of events: When Bias left the house at around 5 a.m., she saw him being followed by a purple Monte Carlo, which she knew to be Ernest's car. When Bias returned, the Monte Carlo parked in front of the house. Defendant and Brandon got out of the

car, both armed with guns and dressed in black jogging pants and black hooded sweatshirts, and got in Bias's car. Defendant was pointing his gun at Bias's head. Bias then drove away with the two brothers. Johnson watched the whole scene from her basement window and said, "I know when they left that [Bias] was going to be killed."

Johnson admitted that she made this statement, and she also admitted that she repeated the same story in her later video statement.

Johnson testified that she spoke with defendant again on July 8, 2003, after the alleged murder had taken place. She denied that defendant said he shot Bias in the back of the head, then put his foot on the gas pedal so that Bias's car crashed into a tree. She also denied that defendant talked about running away under a park viaduct to a pay phone. However, she admitted giving such an account of events in both her handwritten statement and her video statement. In particular, on the video, she quoted defendant as saying, "I shot that mother----er in the back of his head" and asking Brandon, "Did you see how that b---- flinched when I shot him?"

On cross-examination, Johnson testified further regarding the circumstances under which she made her prior statements to the police. She said that the Riverdale police had told her to bring a sample of Bias's hair and his toothbrush to them, and when she arrived at the station, they arrested her and told her that she was accused of involvement in the murder. She said that she was frightened and therefore made up the story she told them. However, on redirect, she admitted that in both the handwritten statement and the video, she stated that she was not threatened or forced to speak by the police.

The State also called both ASA Enright and ASA Thakkar to the stand. ASA Enright

testified that Johnson gave her statement to the police voluntarily. He said that he did not threaten her, nor did he know of any threats against her. Moreover, she was "forthcoming" with information and did not appear to be under duress. ASA Thakkar testified that when Johnson gave her video statement, she said that the police had treated her fine. Over defendant's objection, the video of Johnson's statement was played before the jury.

Also testifying for the State was Gerard Jimerson, a Four Corner Hustler who knew the McCarter brothers. He testified that he lived at 137th and State in Riverdale, and at around 6:30 a.m. on July 8, 2003, defendant and his brother Brandon came to his house. They told him that they had dropped some drugs from their car while being chased by the police, and they asked him to give them a ride back to Ford Heights. On cross-examination Jimerson further testified that they said nothing about having killed anyone.

Jimerson said that he drove them back to the house of defendant's mother in Ford Heights. All three entered and found Ernest inside. After Jimerson left the room that Ernest was in, he heard defendant telling Ernest, "Put that up." Jimerson testified that he believed defendant was referring to a gun.

Around July 9 or 10, Jimerson was back in Ford Heights speaking with defendant. Defendant told him that Shedrick Turner was in custody for Bias's murder. According to Jimerson, defendant then told Jimerson that he knew what was going on and if Jimerson said anything, defendant would kill him, his children, and his girlfriend. Defendant also said that "he shot that mother----er."

A couple days later, while Jimerson was drinking and smoking with defendant and James

Jenkins, defendant blurted out that "he didn't know mother----er hair can flame up like that." Later that day, Jimerson went with his brother Abdullah, defendant, Brandon, and James Jenkins to a forest preserve. Jimerson testified that defendant was crying, while Brandon was saying that "he's not fitting to do no hundred years." Brandon also said that "the hanging come before the catching"; according to Jimerson, that meant that "before he get caught, he'll f--- me up."

Jimerson also stated that he had asked the State's Attorney's office to move him to a different location after the case was over, and the State agreed to pay for his moving expenses, his first month's rent, and his security deposit.

On cross-examination, Jimerson testified that Ernest had owned a purple Monte Carlo in July 2003, but he said that the car had no transmission and thus could not be driven; it was simply sitting in front of the McCarter house.

The State also brought in a number of witnesses to testify regarding the physical evidence. Dr. Claire Helen Cunliffe, a certified forensic pathologist working for the office of the medical examiner in Chicago, testified that Bias's autopsy showed that he had a gunshot wound in the back of his head and that he had already died from that wound before his body burned.

Sergeant Dempsey of the Ford Heights police department testified that while executing a search warrant for the house of defendant's mother, he found a loaded .357 Ruger revolver with one spent round. Walter Sherk, a forensic science examiner working for the Illinois State police crime lab in Joliet, examined the bullet recovered from Bias's body as well as the gun found by Dempsey. He testified that the bullet was consistent with a gun of that caliber and rifling pattern, but he could not definitively tell whether the bullet had been fired from that specific weapon.

-7-

Sergeant Dempsey also testified that he test drove Ernest's Monte Carlo and found that it could successfully run, though he only drove it for five feet forward and back.

The sole witness for the defense was James Jenkins, who testified that in July 2003 he was a member of the Four Corner Hustlers and a friend of the defendant. Sometime after Bias's death, Jenkins was together with defendant, Jimerson, and Abdullah; later Brandon joined them, and they all went to a forest preserve. According to Jenkins, they were just talking about women. He testified that there was no mention of Bias and no conversation in which defendant admitted involvement in the murder or commented about Bias's hair on fire. He also stated that there was no disagreement between Jimerson and defendant, and he denied that defendant or his brother had threatened Jimerson.

After both sides had rested, the State sought to have the autopsy photographs of Bias's body sent back to the jury, arguing that they corroborated witness testimony about the manner of Bias's death. Defense counsel objected on grounds that the photos were not relevant to any issue that was actually contested, so they would serve only to prejudice the jury. The trial court decided, over defense counsel's objection, that the State could choose any three of the photos to go back with the jury, but no more. The State selected (1) People's Exhibit 36, a photo of Bias's charred chest and upper abdomen, and (2) People's Exhibit 43, a photo of the inside of Bias's skull showing the bullet wound to which pathologist Dr. Cunliffe had testified.[1]

In addition, the trial court allowed Johnson's video statement to go back to the jury. The reason the State gave for wanting to send back the video was that Johnson had implied that she

---

[1] The third photo selected by the State is not at issue in this appeal.

spoke to the police under duress or coercion, and the State believed that Johnson's demeanor on the video would help to rebut that claim. The jury was given an instruction on how to consider prior inconsistent statements; the instruction explained, in relevant part, that such statements "may be considered by you only for the limited purpose of deciding the weight to be given to the testimony you heard from the witness in this court room." It also stated that this limitation did not apply to statements "that the witness has personal knowledge of," though it did not define the term "personal knowledge."

The jury found defendant guilty of first degree murder and found that he personally fired the gun that killed Bias.

Defendant then filed a *pro se* posttrial motion for a new trial, alleging ineffective assistance of trial counsel. The motion alleged several different omissions by his counsel: (1) failure to file pretrial motions that defendant had wanted to be filed; (2) failure to heed defendant's wish for a bench trial as well as his wish to testify; (3) failure to meaningfully interview witnesses, investigate information, and discuss the case with defendant; (4) failure to call exculpatory witnesses on his behalf; and (5) failure to investigate the background of an accusing witness. (Only the allegations related to defendant's right to a bench trial and defense counsel's failure to call witnesses are at issue in this appeal.)

The court held a hearing on the motion in which it questioned defendant about these contentions, asking him about the basis for each allegation in turn. Regarding defendant's allegation that he was denied his wish for a bench trial, the entire exchange between the court and the defendant was as follows:

"THE COURT: You also indicate that, Number 3, you indicated that you wanted a bench trial, but, however, your attorney wanted a jury trial; is that correct?

MR. McCARTER: Yes, sir."

Regarding defendant's contention that trial counsel had failed to call witnesses on his behalf, the court asked defendant to name the specific witnesses and explain what they could have said to change the outcome of the case. Defendant first named his brother Ernest, but he admitted that Ernest was not in the area and could not be located. He also named his parents, saying that they would testify that he had been at home at the time the murder allegedly occurred. He explained that due to his drug addiction, he "was out there in the streets" and could not remember what was happening or where he was at the time of the incident, while his parents had clearer memories of events at the time.

At the conclusion of this hearing, the court denied defendant's motion for a new trial, saying, "I don't believe that [a new trial] would assist you in any way." It went on to explain:

"I believe that [defense attorney] Mr. Grace did, in fact, do everything necessary that a competent attorney would do. In fact, I commented that I was very impressed by all of the attorneys in this case how well they presented this case. *** You haven't been out to really tell us how any witnesses would have assisted you in terms of having the outcome be different in this case. In terms of a bench trial, quite frankly, I would have found you guilty also. So that would not have been – made a difference."

At defendant's request, the trial court then appointed the public defender to represent defendant for sentencing.

On November 14, 2005, the trial court sentenced defendant to 60 years' imprisonment for first degree murder. The instant appeal followed.

## II. ANALYSIS

On appeal, defendant has three major contentions: first, that his trial counsel's failure to object to the introduction of certain inadmissible evidence was ineffective assistance of counsel; second, that the jury should not have been allowed to view gruesome autopsy photos of the victim; and third, that the court erred in failing to properly investigate the factual allegations in his *pro se* posttrial motion claiming ineffective assistance of counsel.

### A.

Regarding his first contention, defendant argues that some of Johnson's prior inconsistent statements introduced by the State at trial were inadmissible – in particular, the portion of Johnson's prior statement in which she said that defendant admitted and gave details about his commission of the murder – as was the lay opinion testimony of Johnson and Jimerson giving incriminating interpretations to statements made by defendant and his brother Brandon. Defendant further urges that his trial counsel's failure to raise objections to the introduction of these pieces of evidence was such poor trial strategy that it constituted ineffective assistance of counsel. We find that, although some of the complained-of evidence was introduced in error, the remaining admissible evidence against defendant was so strong that no prejudice resulted to him from the error; therefore, his ineffective assistance claim fails.

The State initially contends that defendant has waived this issue on appeal, as he did not raise these specific evidentiary issues in his *pro se* posttrial motion alleging incompetence of his

counsel. In order to preserve an issue for appeal, a defendant must both make an objection at trial and raise the specific issue in a posttrial motion. *People v. Woods*, 214 Ill. 2d 455, 470, 828 N.E.2d 247, 256-57 (2005), citing *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129 (1988). Omission of either of these steps results in waiver. *Woods*, 214 Ill. 2d at 470, 828 N.E.2d at 256-57.

Defendant contends that it is a violation of fundamental fairness for us to find waiver based on a motion that was written *pro se*; he argues that the doctrine of waiver should only apply to situations where defendant has the assistance of counsel. However, we need not rule upon this contention at this point, for even if we were to find that defendant had waived the issue, we would still be able to consider it under the second prong of the plain error rule, if defendant's contentions of ineffective assistance were correct. Under the plain error rule, an appellate court may consider unpreserved error when either (1) the evidence is so closely balanced that the error alone might have been the decisive factor against the defendant, or (2) the error was so substantial that defendant was deprived of a fair trial. *People v. Herron*, 215 Ill. 2d 167, 178-79, 186-87, 830 N.E.2d 467, 475, 479 (2005); see 107 Ill. 2d R. 615(a) ("[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court"). Both prongs of this disjunctive test are designed to ensure that defendants receive a fair trial: if an error might result in wrongful conviction of an innocent person, or if it threatens the integrity of the judicial process, then it is proper that we consider it regardless of waiver below. *Herron*, 215 Ill. 2d at 177-79, 830 N.E.2d at 475; *People v. Carlson*, 79 Ill. 2d 564, 576-77, 404 N.E.2d 233, 238 (1980).

With respect to the case at hand, if a defendant can successfully prove ineffective assistance of counsel, this is considered a substantial impairment of fundamental rights, thus satisfying the second prong of the *Herron* test and triggering the plain error rule. See *People v. Chandler*, 129 Ill. 2d 233, 242, 543 N.E.2d 1290, 1293 (1989) (proceeding to the merits of a defendant's ineffective assistance of counsel claim despite the fact that the claim was not raised in his postsentencing motion). Hence, we would be amiss in resting upon the doctrine of waiver instead of examining the merits of defendant's claim that he was deprived of his constitutional right to counsel. Indeed, we note that the State's only answer to defendant's contentions regarding the plain error doctrine is an argument on the merits that defendant's counsel acted properly and thus no error occurred. See *People v. Cooper*, 132 Ill. 2d 347, 358, 547 N.E.2d 449, 455 (1989) (no plain error where defendant contends, but fails to prove, ineffective assistance of counsel).

Therefore, we move to substantive consideration of defendant's ineffective assistance claim. Under the sixth and fourteenth amendments to the United States Constitution and article I, section 8 of the Illinois Constitution, the defendant in any criminal case has a right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685, 80 L. Ed. 2d 674, 691-92, 104 S. Ct. 2052, 2063 (1984); *People v. Jackson*, 205 Ill. 2d 247, 258-59 (2001). " 'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *People v. Albanese*, 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255 (1984), quoting *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

Under *Strickland*, to prevail in an ineffective assistance claim, the defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that this deficiency in counsel's performance was prejudicial to the defense. *Strickland*, 466 U.S. at 687, 692, 80 L. Ed. 2d at 693, 696, 104 S.Ct. at 2064, 2067; *Albanese*, 104 Ill. 2d at 525, 473 N.E.2d at 1255 (citing *Strickland*). As shall be explained below, although defendant's counsel failed the first prong of the *Strickland* test, we find that defendant has not adequately demonstrated that he was prejudiced by this failure, taking into account all of the properly admitted evidence that the prosecution gathered against him. Therefore, defendant's ineffective assistance claim fails.

With regard to the first prong of the *Strickland* test, we recognize that the defendant "must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *Jackson*, 205 Ill. 2d at 259, 793 N.E.2d at 9. Defendant argues that because the aforementioned statements strongly implicated him in the murder and were inadmissible as a matter of law, failing to object to them could not have been a reasonable trial strategy. The State, on the other hand, contends that the statements were properly admitted, so failure to object was no deficiency at all.

We must therefore consider the admissibility of the challenged prior inconsistent statements of Johnson regarding her July 8, 2003, conversations with defendant where he allegedly admitted to shooting Bias and gave details about the murder and his subsequent getaway. The State contends that these statements were admissible both as substantive evidence and as impeachment. With respect to substantive admissibility, the State tacitly admits that

Johnson's statements are hearsay, but argues that they fall under the prior inconsistent statement exception to the hearsay rule. With respect to their use for impeachment purposes, the State argues that they were properly admitted because Johnson's trial testimony contradicted them on matters that were not collateral.

The general rule is that hearsay, defined as an out-of-court statement offered for the truth of the matter asserted, is inadmissible at trial. *People v. Brooks*, 297 Ill. App. 3d 581, 583, 697 N.E.2d 343, 345-46 (1998). However, there is an exception to the hearsay rule for prior inconsistent statements of a testifying witness. Under section 115-10.1 of the Illinois Code of Criminal Procedure of 1963, a prior inconsistent statement of a witness may be admitted as substantive evidence if it "narrates, describes, or explains an event or condition of which the witness had personal knowledge." 725 ILCS 5/115-10.1(c)(2) (West 2006). The State contends that Johnson's pretrial testimony falls within this exception. Defendant, on the other hand, contends that Johnson lacked "personal knowledge" of the events she spoke of within the meaning of section 115-10.1, so the exception does not apply and her statement remains inadmissible hearsay.

For the "personal knowledge" requirement to be satisfied, " 'the witness whose prior inconsistent statement is being offered into evidence must actually have seen the events which are the subject of that statement.' [Citations.]" *People v. Cooper*, 188 Ill. App. 3d 971, 973, 544 N.E.2d 1273, 1275 (1989). Hence, "[e]xcluded from this definition are statements made to the witness by a third party, where the witness has no firsthand knowledge of the event that is the subject of the statements made by the third party." *People v. Morgason*, 311 Ill. App. 3d 1005,

1011 (2000). That is, the witness must have observed the events being spoken of, rather than simply hearing about them afterwards. *Morgason*, 311 Ill. App. 3d at 1011, 726 N.E.2d 749, 753; see also *People v. Coleman*, 187 Ill. App. 3d 541, 546, 543 N.E.2d 555, 559 (1989) ("Simply overhearing incriminating statements made by a defendant is not enough").

The rationale behind this requirement is ensuring reliability through giving defendants a meaningful opportunity for cross-examination. In general, Illinois courts look with suspicion upon the introduction of prior statements of witnesses, since "allow[ing] an accused to be convicted on the extrajudicial statements of witnesses *** runs counter to the notions of fairness on which our legal system is founded." *People v. Spicer*, 79 Ill. 2d 173, 180, 402 N.E.2d 169, 172 (1979). However, when a witness has personal knowledge of the events contained in a prior inconsistent statement, the reliability of the statement is increased, since "a witness is less likely to repeat another's statement if he witnessed the event and knows the statement is untrue." *People v. Morales*, 281 Ill. App. 3d 695, 701, 666 N.E.2d 839, 843 (1996). Furthermore, when the witness is cross-examined at trial about the truth of that prior statement, the jury may observe the witness's demeanor during cross-examination to gauge the truth or falsity of the prior statement vis-a-vis the witness's current version of events. *People v. Hubbard*, 276 Ill. App. 3d 98, 105, 657 N.E.2d 1159, 1164 (1995), citing M. Graham, *Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence, 801(d)(1)(a), 613 and 607*, 75 Mich. L. Rev. 1565, 1584 (1977). By contrast, if the witness is merely narrating a third-party statement about which the witness has no personal knowledge, cross-examination gives the jury no insight into the truth of that statement,

making it more difficult to judge its reliability. *Hubbard*, 276 Ill. App. 3d at 105, 657 N.E.2d at 1164; see *People v. Robinson*, 73 Ill. 2d 192, 200, 383 N.E.2d 164, 169 (1978) (key problem with hearsay testimony "is the opposing party's inability to test the real value of the testimony by exposing the source of the assertion to cross-examination").

Hence, prior inconsistent statements which consist of secondhand accounts of events are still inadmissible hearsay, notwithstanding section 115-10.1. The facts of the *Morgason* case are illustrative in this regard. In *Morgason*, defendant was charged with murder. At trial, the State introduced a tape-recorded statement by defendant's ex-wife in which she claimed that defendant admitted that he and his friends murdered the victim. *Morgason*, 311 Ill. App. 3d at 1009, 726 N.E.2d at 751-52. The reviewing court found that substantive use of this tape as a prior inconsistent statement was in error, because there was no evidence that the ex-wife was present at the murder scene or observed firsthand any of the events which transpired at the scene. *Morgason*, 311 Ill. App. 3d at 1011, 726 N.E.2d at 753. See also *Cooper*, 188 Ill. App. 3d at 973, 544 N.E.2d at 1275 (witness had no "personal knowledge" of events where defendant allegedly told him that he committed the robbery at issue; hence, prior inconsistent statement where the witness spoke of his conversation with defendant should not have been admitted as substantive evidence).

Under the rule articulated in these cases, we find that Johnson had personal knowledge of the events she purportedly witnessed at her house – in particular, defendant and his brother leading Bias away at gunpoint in his own car on the morning of Bias's death – but she did not have personal knowledge regarding the murder of Bias. Since she allegedly saw with her own

eyes the scene where Bias was led away, her prior inconsistent statements regarding that scene are admissible as substantive evidence. See 725 ILCS 5/115-10.1 (West 2006). By contrast, her account of the things she heard defendant saying about the murder is highly analogous to the substantively inadmissible statements in *Morgason* and *Cooper*: as there is no evidence linking Johnson to the actual scene of the murder, she could not have personal knowledge of the events defendant described and was purportedly bragging about. See *Morgason*, 311 Ill. App. 3d at 1011, 726 N.E.2d at 753; *People v. Wilson*, 302 Ill. App. 3d 499, 508-09, 706 N.E.2d 1026, 1032-33 (1998). The State argues that Johnson did have personal knowledge that defendant and his brothers were planning to rob and kill Bias, citing earlier portions of her prior inconsistent statements read at trial. However, this is irrelevant to the issue of whether Johnson had personal knowledge of the specific facts described in the testimony at issue. As there is no allegation that Johnson witnessed Bias's death and defendant's subsequent getaway with her own senses, rather than simply hearing about them secondhand from defendant, her statements regarding these events do not fall within the exception of section 115-10.1 (725 ILCS 5/115-10.1(c)(2) (West 2006)). Hence, to the extent that the State sought to use them to prove the truth of the matters Johnson spoke of – *i.e.*, the fact of defendant's guilt as well as the means by which he committed the murder and then fled – they were inadmissible hearsay, and the court erred by allowing their introduction.

The State, however, argues that even if Johnson's statements regarding the murder of Bias were not substantively admissible, they were still admissible as impeachment evidence, particularly in light of the cautionary instruction given to the jury on the proper use of

impeachment evidence. We do not have to resolve the sufficiency of the jury instruction, because we find that these statements were inadmissible for purposes of impeachment.

It is true that, even if a statement is not admissible for the truth of the matter asserted under section 115-10.1, that does not automatically preclude it from being used for impeachment purposes. 725 ILCS 5/115-10.1 (West 2006) ("Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement *** fails to meet the criteria set forth herein"). The State argues that the statements at issue would have been admissible as a means of impeaching Johnson's trial testimony and, hence, that any error in admitting them as substantive evidence was harmless. See *People v. Morales*, 281 Ill. App. 3d 695, 701, 666 N.E.2d 839, 843 (1996) (finding harmless error where the court below improperly introduced prior inconsistent statements as substantive evidence, but said statements would have been admissible as impeachment).

Johnson's trial testimony is indeed inconsistent with her prior statements that the State introduced into evidence, and those statements dealt with noncollateral matters, both of which are prerequisites to the introduction of evidence as a prior inconsistent statement. See *People v. Thomas*, 354 Ill. App. 3d 868, 877, 821 N.E.2d 628, 636 (2004). However, there is an additional prerequisite to the use of impeachment evidence which the State declines to confront in its brief: A party may only impeach its own witness through use of a prior inconsistent statement when the testimony of that witness does "affirmative damage" to the party's case. *People v. Cruz*, 162 Ill. 2d 314, 361-62, 643 N.E.2d 636, 659 (1994), citing *People v. Bradford*, 106 Ill. 2d 492, 500, 478 N.E.2d 1341, 1344 (1985). For witness testimony to be affirmatively damaging, it must do more

than fail to support the State's position; it must give "positive aid" to the defendant's case, for instance, by being inconsistent with the defendant's guilt under the State's theory of the case. *Cruz*, 162 Ill. 2d at 362, 643 N.E.2d at 659; see *Bradford*, 106 Ill. 2d at 500, 478 N.E.2d at 1344. It is insufficient that a witness merely disappoints the State by failing to incriminate the defendant. *Cruz*, 162 Ill. 2d at 362, 643 N.E.2d at 659.

This limitation on the use of prior inconsistent statements is necessary because the purpose of impeachment is to cancel out damaging testimony by a witness; if no such damaging testimony has been proffered, then the only purpose of introducing a prior inconsistent statement is to get it before the jury as substantive evidence. *Cruz*, 162 Ill. 2d at 362, 643 N.E.2d at 659. Contrary to the State's implication, use of jury instructions as to the purpose of such statements does not cure this fault, for "[i]t is well recognized that jurors may find it difficult to consider prior inconsistent statements solely to determine credibility and may afford such testimony substantive value." *Cruz*, 162 Ill. 2d at 364, 643 N.E.2d at 659, citing *People v. Bailey*, 60 Ill. 2d 37, 43, 322 N.E.2d 804, 808 (1975).

In this case, Johnson's refusal to incriminate defendant did not cause any affirmative harm to the prosecution's case; she did not offer evidence of his innocence but merely declined to come forward with evidence of his guilt. Hence, under the standard articulated in *Cruz* and *Bradford*, the State had no legitimate need to impeach her credibility, and thus her prior inconsistent statements were inadmissible for that purpose. *Cruz*, 162 Ill. 2d at 362, 643 N.E.2d at 659; *Bradford*, 106 Ill. 2d at 500, 478 N.E.2d at 1344.

We next consider the admissibility of the statements that defendant characterizes as

impermissible opinion testimony by lay witnesses. Specifically, defendant objects to Johnson's testimony regarding her interpretation of conversations she had with the McCarter brothers: in her video statement, when Brandon said "it's going down," Johnson said that she understood that to mean that the brothers planned to rob Bias and kill him if he refused to give up the money. Defendant also objects to the testimony of Jimerson in which he says that when he heard defendant telling Ernest to "put that up," he believed that defendant was referring to a gun. Finally, defendant objects to Jimerson's statement that when Brandon told him "the hanging come before the catching," Brandon meant that he would "f--- [Jimerson] up."

Under Illinois law, "the testimony of a lay witness must be confined to statements of fact of which the witness has personal knowledge." *People v. Brown*, 200 Ill. App. 3d 566, 578, 558 N.E.2d 309, 316 (1990). Hence, while a lay witness may testify to his observations or sensory perceptions, he generally may not give his opinions or interpretations of those observations. *Brown*, 200 Ill. App. 3d at 578, 558 N.E.2d at 316. In particular, when a witness testifies as to an out-of-court statement, he is required to recite it as accurately as possible without offering his opinion as to what that statement might mean. *People v. Linkogle*, 54 Ill. App. 3d 830, 833, 368 N.E.2d 1075, 1078 (1977); *People v. Holveck*, 141 Ill. 2d 84, 105-06, 565 N.E.2d 919, 928 (1990). For instance, in *Brown*, the court on appeal found that the trial court erred in allowing a witness to testify as to what the defendant meant by the remark " 'have some of this.' " *Brown*, 200 Ill. App. 3d at 579, 558 N.E.2d at 317. The court reasoned that the conclusion drawn by the witness was not an obvious one under the facts, so it went beyond the realm of mere sensory perception or observation. *Brown*, 200 Ill. App. 3d at 579, 558 N.E.2d at 317. See also

*Linkogle*, 54 Ill. App. 3d at 833, 368 N.E.2d at 1078 (where defendant was charged with indecent liberties with a child, the trial court erred in allowing the mother to testify as to what she believed her daughter had meant when she testified that she saw defendant " 'wriggle his thing' "). It is the jury's job to draw inferences from the facts, not the witnesses' job to provide inferences for them. See *Holveck*, 141 Ill. 2d at 106, 565 N.E.2d at 929 (if a witness statement leaves no room for the jurors to make their own interpretation of facts, then it "invade[s] the province of the jury").

We find that the complained-of statements in the instant case, as with the statements in *Brown*, go beyond the realm of mere observation, crossing the line into impermissible opinion testimony by lay witnesses. On its face, Brandon's statement that "it's going down" helps establish the pendency of a crime, but it does not connect to the specific crime or victim involved here. Thus, Johnson's explanation that Brandon was speaking about a plan to rob Bias was not merely sensory perception or a recitation of facts; it required an inferential step in her mind as to what was "going down" for Brandon. The same kind of inferential step is present in the two aforementioned statements by Jimerson mentioned at trial. Hence, these statements were impermissible opinion testimony (*Linkogle*, 54 Ill. App. 3d at 833, 368 N.E.2d at 1078; *Holveck*, 141 Ill. 2d at 105-06, 565 N.E.2d at 928) and should not have been admitted.

In sum, defendant is correct in his contention that certain evidence introduced by the State at trial was inadmissible, and therefore he is also correct that his trial counsel erred by failing to maintain its objection to this evidence. We also find that such failure was not reasonable as a matter of trial strategy, since the evidence thereby introduced was significantly

incriminating: defendant's alleged statements regarding the murder, as related by Bias's girlfriend, would constitute a clear admission of the crime if believed by the jury. The allegations that Brandon was planning to rob Bias and was later planning to harm Jimerson rather than be caught are likewise damaging, insofar as the prosecution sought to demonstrate that defendant was complicit with Brandon. Although under *Strickland* we are called to give deference to the strategy of trial counsel (*Jackson*, 205 Ill.2d at 259, 793 N.E.2d at 9), in this case, the complained-of evidence was not susceptible to any strategic justification, nor was there an effort made to rationalize its strategic value. Hence, we find that defendant has met his burden of demonstrating that trial counsel fell short of the standard of reasonableness required under *Strickland*.

However, this is only the first prong of the *Strickland* test; in order to prevail in his ineffective assistance claim, defendant must also demonstrate that counsel's error prejudiced him. The State contends that because the evidence against defendant was so overwhelming, even if the disputed evidence were found to be inadmissible, its introduction changed nothing: excluding the complained-of evidence would not have reversed the outcome of the trial. We agree.

To meet his burden under *Strickland*, defendant must show that the probability that counsel's errors changed the outcome of the case is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. It is not necessary for defendant to prove by a preponderance of the evidence that the outcome would have been different; rather, defendant need only demonstrate that " 'there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Albanese*, 104 Ill. 2d at 525, 473 N.E.2d at 1255, quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *cf. Kyles v. Whitley*, 514 U.S. 419, 433-34, 131 L. Ed. 2d 490, 505-06, 115 S. Ct. 1555, 1565-66 (1995) (applying a similar standard in deciding when to reverse convictions because the prosecution improperly concealed exculpatory evidence from the defense). Indeed, prejudice may be found even when the chance that minimally competent counsel would have won an acquittal is "significantly less than 50 percent," as long as a verdict of not guilty would be reasonable. *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001). In weighing the impact of counsel's errors, the reviewing court should consider the totality of the evidence before the finder of fact. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069. That is, instead of viewing the improper evidence in isolation, the reviewing court must look to the ramifications the improper evidence might have had on the factfinder's overall picture of events. *Strickland*, 466 U.S. at 695-96, 80 L. Ed. 2d at 698-99, 104 S. Ct. at 2069; see *People v. Moore*, 279 Ill. App. 3d 152, 162, 663 N.E.2d 490, 498 (1996) (in analyzing the prejudice prong of *Strickland*, the reviewing court should consider "the fundamental fairness of the proceeding as a whole").

In this case, taking into account the totality of the evidence which the State presented to the jury, we cannot find that the errors complained of are sufficient to undermine our confidence in the jury's verdict. See *Albanese*, 104 Ill. 2d at 525, 473 N.E.2d at 1255, citing *Strickland*, 466 U.S. at 694, 80 L.Ed.2d at 698, 104 S. Ct. at 2068. The State recovered a loaded gun with one spent round from defendant's mother's house, which, upon testing, was consistent with the single

bullet removed from the victim's body. Johnson's direct in-court testimony established a possible motive for the crime: not only did the McCarter brothers and Bias belong to opposing gangs, but she said they were feuding over drug territory. While we have held that the prior testimony of Johnson regarding defendant's admission that he was the shooter was inadmissible due to her lack of personal knowledge, her prior testimony was admissible with regard to her firsthand observation of the defendant and his brother holding Bias at gunpoint and entering his car within an hour of when the murder allegedly took place. Furthermore, Jimerson testified directly in court that shortly after the alleged murder, defendant and Brandon appeared at Jimerson's house, which was in close proximity to the place where Bias' body was recovered. He also testified that, a day or two after the victim's death, he and the defendant were discussing the murder, at which time defendant admitted that "he shot that mother----er." Finally, Jimerson testified that the McCarter brothers expressed fear of being caught and made other inculpatory statements during their trip to the forest preserve, although defendant's friend Jenkins, a fellow gang member at the time, denied hearing any such comments. In particular, Jimerson stated that defendant said "he didn't know mother----er hair can flame up like that" while his brother Brandon said that "he's not fitting to do no hundred years." Given the combined weight of this body of admissible testimony, there is no reasonable probability that the complained-of evidence had any significant impact on the jury's overall picture of events, so the fundamental fairness of the trial was not compromised. See *Strickland*, 466 U.S. at 695-96, 80 L. Ed. 2d at 698-99, 104 S. Ct. at 2068-69; *Moore*, 279 Ill. App. 3d at 162, 663 N.E.2d at 498. Accordingly, the prejudice prong of the *Strickland* test is not met, and so defendant's contentions regarding ineffective

assistance of counsel must fail.

B.

Defendant's next contention is that the trial court erred in allowing the jury to view certain autopsy photos of the victim. Defendant argues that the photos of Bias's charred body and the inside of Bias's skull, shown to the jury over his counsel's objection, were prejudicial and not relevant to any contested facts, thus depriving him of a fair trial.

At the outset, the State contends that defendant has waived this issue as well, as he did not include it in his posttrial motion. See *Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1129; *Woods*, 214 Ill. 2d at 470, 828 N.E.2d at 256-57. However, defendant argues that it is improper for a court to base a finding of waiver upon a motion that was filed *pro se*, because it is fundamentally unfair and contrary to Illinois law to hold a *pro se* defendant to the same standard that one would expect of counsel. Defendant cites the cases of *People v. Lawton*, 212 Ill. 2d 285, 296, 818 N.E.2d 326, 333 (2004), and *People v. Foreman*, 361 Ill. App. 3d 136, 142, 836 N.E.2d 750, 756 (2005), in support of his contention that no waiver occurred. However, neither of these cases is applicable to the situation at hand. In *Foreman*, defense counsel who had represented the defendant at trial filed a posttrial motion, but failed to allege his own ineffective assistance as counsel for his client; likewise, in *Lawton*, defense counsel who had represented the defendant at trial also handled defendant's appeal on direct review and failed to allege his own ineffective assistance. The *Foreman* and *Lawton* courts nevertheless ruled that the ineffective assistance claims were not waived, because of the inherent conflict of interest created by a lawyer having to argue his own incompetence. *Lawton*, 212 Ill. 2d at 296, 818 N.E.2d at 333; *Foreman*, 361 Ill.

-26-

App. 3d at 142, 836 N.E.2d at 756. By contrast, there is no conflict of interest involved when a defendant, acting under his own impetus, argues that his lawyer failed to effectively represent him. As a result, the reasoning of these cases does not apply here.

Defendant next contends that he should not be held to waiver since he was not represented by counsel in the preparation and presentation of his posttrial motion. However, contrary to defendant's contention, *pro se* defendants are not entitled to favored treatment and do not have license to disregard procedural requirements. *People v. Anderson*, 262 Ill. App. 3d 349, 352, 633 N.E.2d 699, 701 (1992), citing *Faretta v. California*, 422 U.S. 806, 834 n.46, 45 L. Ed. 2d 562, 581 n.46, 95 S.Ct. 2525, 2541 n.46 (1975) (stating that the right of self-representation is not a license not to comply with relevant rules of procedural and substantive law). Thus, in *Anderson*, a defendant who represented himself at trial was deemed to have waived a fifth amendment argument by failing to raise any objection at trial and in his posttrial motion. *Anderson*, 262 Ill. App. 3d at 352, 633 N.E.2d at 701; see also *People v. Fowler*, 222 Ill. App. 3d 157, 162-63, 583 N.E.2d 686, 691 (1991) (defendant who appeared *pro se* at trial could not raise the issue of lack of probable cause on appeal, as he failed to raise it as an objection at trial or in his posttrial motion); *People v. Bond*, 178 Ill. App. 3d 1020, 1023-24, 534 N.E.2d 156, 159 (1989) (*pro se* defendant waived his right to seek a severance of charges when he failed to request it at trial or in his posttrial motion). Accordingly, the fact that defendant in the instant case was not represented by counsel in preparing his posttrial motion does not exempt him from the well-established doctrine of waiver.

Defendant, however, seeks to rely upon the cases of *People v. Janes*, 158 Ill. 2d 27, 35,

630 N.E.2d 790, 793 (1994), and *People v. Brasseaux*, 254 Ill. App. 3d 283, 287-88, 660 N.E.2d 1321, 1324 (1996), to support his contention that waiver should not be inferred from an omission in a posttrial motion where the defendant files that motion *pro se*. In each of these cases, the court considered the right to counsel at various stages of litigation. In *Janes*, the issue was the right to effective representation with respect to a defendant's motion to withdraw a guilty plea; in *Brasseaux*, the issue was appointment of counsel in a hearing on a motion to reconsider sentence. *Janes*, 158 Ill. 2d at 33, 630 N.E.2d at 792; *Brasseaux*, 254 Ill. App. 3d at 287-88, 660 N.E.2d at 1324. In determining in each of these cases that the right to counsel existed, the court considered the fact that for each of these motions, an omission would trigger waiver, which emphasized the defendant's need for the assistance of counsel. In neither of these cases did the court attempt to state that where the right to counsel was not available, waiver by omission would not be invoked.

Moreover, in the instant case, defendant's right to counsel during the filing of his posttrial motion is not at issue. Defendant was not denied the assistance of counsel; rather, he had trial counsel, but he chose to proceed without the aid of that counsel in filing his own motion before the court. He must therefore bear the risks inherent in that decision. A defendant who deliberately rejects the assistance of the attorney who is currently representing him is not thereby absolved from having to follow the rules of procedure. See *Anderson*, 262 Ill. App. 3d at 352, 633 N.E.2d at 701, citing *Faretta*, 422 U.S. at 834 n.46, 45 L. Ed. 2d at 581 n.46, 95 S. Ct. at 2541 n.46. Thus, the reasoning of *Janes* and *Brasseaux* concerning the right to counsel at critical stages of a criminal proceeding is not applicable here. Where a defendant chooses to forego his right to counsel, he will still be held to waiver.

No. 1-06-0058

For the same reason, defendant's next contention, that he was entitled to counsel during the filing of his posttrial motion under *People v. Finley*, 63 Ill. App. 3d 95, 103, 379 N.E.2d 645, 650 (1978), is inapplicable, since as discussed above, he deliberately chose not to use counsel for the filing of that motion.

Defendant furthermore contends that, even if we were to find that waiver is applicable to defendant's motion, we should choose to overlook any such waiver under the plain error rule. We disagree. As stated earlier, courts may choose to overlook waiver and consider defendant's contentions on the merits if the evidence is closely balanced, or if the error was substantial enough to deprive defendant of fundamental rights. *Herron*, 215 Ill. 2d at 177-79, 830 N.E.2d at 475. However, in this case, neither prong of the *Herron* test is satisfied. With respect to the first prong, the evidence was not closely balanced: as discussed above, the State had a very strong body of evidence against defendant, even without taking into account the autopsy photos that defendant argues should not have been shown to the jury.[2] When a defendant seeks to establish prejudice for purposes of the plain error rule, the defendant bears the burden of persuasion. *Woods*, 214 Ill. 2d at 471, 828 N.E.2d at 257, citing *People v. Thurow*, 203 Ill. 2d 352, 363, 786 N.E.2d 1019, 1025 (2003). Given the weight of fully admissible evidence that was introduced at

[2] In this regard, we note that logically, the autopsy photos would only prejudice the jury against defendant to the extent that it believed, under all the evidence, that defendant committed the crime in question. That is, the gruesome nature of the crime would not influence the jury's opinion of defendant if it did not conclude that the State had sufficiently established his guilt. Hence, the potential prejudicial impact of the photos is arguably minimal.

trial, we cannot say that defendant has met this burden.

Furthermore, any error that might have occurred in the introduction of the photos was not substantial enough to constitute a deprivation of fundamental rights. For this prong of the *Herron* test to be satisfied, defendant must show that the error was so severe that it went beyond " 'typical trial mistakes' " to constitute " 'breakdowns in the adversary system.' " *People v. Keene*, 169 Ill. 2d 1, 17, 660 N.E.2d 901, 910 (1995). In other words, it must be an error so fundamental that it challenges the very integrity of the judicial process. *Herron*, 215 Ill. 2d at 187, 830 N.E.2d at 479-80; *Keene*, 169 Ill. 2d at 17, 660 N.E.2d at 909-10. Introduction of potentially prejudicial autopsy photos, while it might be damaging to the defense, is not the kind of error that strikes at the heart of the proceeding such that this prong of the *Herron* test is triggered. Thus, defendant has not shown plain error, and accordingly, we find that his claim with respect to the autopsy photos is waived and may not be raised for the first time in this appeal.

### C.

Defendant's final contention is that the trial court failed to properly investigate the factual allegations in his *pro se* posttrial motion for ineffective assistance of counsel. He therefore requests that we remand the case for the court below to conduct a proper inquiry under the standard first laid out in *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). The State, on the other hand, argues that the trial court properly reviewed defendant's motion and acted within its discretion in denying it.

In *Krankel*, the defendant filed a *pro se* posttrial motion alleging ineffective assistance of

counsel, and the Illinois Supreme Court ruled that the trial court should have appointed him new counsel to represent him at a hearing on the motion. *Krankel*, 102 Ill. 2d at 187-89, 464 N.E.2d at 1048-49. The rule of *Krankel* has subsequently been interpreted as follows: The appointment of new counsel is not automatically required whenever a defendant files a *pro se* posttrial motion for a new trial based on an ineffective assistance claim. *People v. Crane*, 145 Ill. 2d 520, 533, 585 N.E.2d 99, 105 (1991); *People v. Moore*, 207 Ill. 2d 68, 77, 797 N.E.2d 637 (2003). Instead, in such cases, the trial court must conduct a preliminary inquiry to examine the factual basis behind defendant's claim. If the claim is not meritorious, or if it solely concerns matters of trial strategy, then the court may deny the motion without appointing new counsel. *Moore*, 207 Ill. 2d at 77-78, 797 N.E.2d at 637; see *People v. Ramey*, 152 Ill. 2d 41, 52, 604 N.E.2d 275, 280 (1992) (trial court did not err in declining to appoint new counsel when defendant's claims were "spurious, related to trial tactics or not supported by the record"). It is only when the claim points to possible neglect of the case that new counsel must be appointed under *Krankel*. *Moore*, 207 Ill. 2d at 78, 797 N.E.2d at 637.

In considering whether the trial court has met its burden under *Krankel*, "[t]he operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's pro se allegations of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78, 797 N.E.2d at 638. In most cases, some interchange between the court and trial counsel regarding the complained-of conduct is necessary. *Moore*, 207 Ill. 2d at 78, 797 N.E.2d at 638; *People v. Whirl*, 351 Ill. App. 3d 464, 469, 814 N.E.2d 872, 877 (2004). However, the trial court may also draw upon its observation of defense counsel's performance at trial and the adequacy of

defendant's allegations on their face. *Moore*, 207 Ill. 2d at 79, 797 N.E.2d at 638. As a result, there are instances where a brief discussion between the trial court and the defendant is sufficient for the trial court to properly deny an ineffective assistance claim of this sort. *Moore*, 207 Ill. 2d at 78, 797 N.E.2d at 638, citing *People v. Chapman*, 194 Ill. 2d 186, 230, 743 N.E.2d 48, 74 (2000). For instance, in *Chapman*, the trial court was able to adequately determine by speaking to defendant that some of defendant's ineffective assistance claims were based entirely on matters reserved to trial strategy – whether to call certain witnesses – while the rest were entirely lacking in merit; hence, the trial did not err in failing to appoint new counsel for defendant. *Chapman*, 194 Ill. 2d at 230-31, 743 N.E.2d at 75.

The trial court's decision to decline to appoint new counsel for a defendant based on a judgment that the ineffective assistance claim is spurious shall not be overturned on appeal unless the decision is manifestly erroneous. *People v. Woodson*, 220 Ill. App. 3d 865, 877, 581 N.E.2d 320, 329 (1991). Defendant argues for a *de novo* standard of review, citing *Moore*, 207 Ill. 2d at 79, 797 N.E.2d at 638; however, the facts of *Moore* are inapposite. In *Moore*, the trial court applied the wrong legal standard, as it erroneously believed that defendant's ineffective assistance claim would be cured by the appointment of new counsel on appeal. *Moore*, 207 Ill. 2d at 79, 797 N.E.2d at 638. Because legal questions are subject to a *de novo* standard of review (*People v. Williams*, 188 Ill. 2d 365, 368, 721 N.E.2d 539, 542 (1999)), the *Moore* court applied that standard in assessing the lower court's view of the law. By contrast, the question of whether defendant's ineffective assistance claims are meritorious is necessarily grounded in the specific facts of the case, so it is appropriate for us to give deference to the finding of the trial court, as

No. 1-06-0058

stated in *Woodson*.

For the case at hand, it is defendant's contention that the trial court did not conduct an adequate preliminary inquiry as required under *Krankel* and *Moore* before denying defendant's motion. In his brief, defendant presents only two areas under which he argues additional inquiry was required: first, his allegation that trial counsel failed to call witnesses who would have provided an alibi for him, and second, his allegation that his trial counsel proceeded with a jury trial despite his wish for a bench trial.

With respect to defendant's allegations regarding alibi witnesses, we find that the trial court's decision was not manifestly erroneous in light of its discussion with defendant. Decisions about whether to call witnesses are generally considered matters of trial strategy and reserved to the discretion of trial counsel. *Chapman*, 194 Ill. 2d at 230, 743 N.E.2d at 75. Nevertheless, where alibi witnesses are concerned, a court conducting a preliminary investigation under *Krankel* ought to inquire into matters such as the identities of the witnesses, the substance of their proposed testimony, and the extent to which defendant's counsel knew and acted upon the existence of such witnesses. *People v. Barnes*, 364 Ill. App. 3d 888, 899, 847 N.E.2d 679, 688 (2006).

At the hearing on defendant's motion, the trial court specifically elicited information from defendant about the witnesses' names and the testimony that defendant hoped that they could provide. In its subsequent rejection of this claim, the trial court indicated that defendant had not made a colorable argument for how these witnesses would be able to change the outcome of the case. Defendant also argues that the trial court erred in not discussing the matter with

-33-

defendant's counsel; however, as discussed above, colloquy with trial counsel is not a necessity if the trial court can otherwise determine that defendant's claim does not warrant the appointment of new counsel. *Chapman*, 194 Ill. 2d at 230, 743 N.E.2d at 75. Here, the trial court found that the testimony that defendant sought to elicit would not likely be sufficient to reverse the outcome of the case, and therefore there was no need to ask defense counsel whether it had sought to procure such testimony. We cannot say that this is a patently unreasonable decision, in light of the State's evidence linking defendant to the crime scene itself and placing him in the vicinity shortly afterward.

Furthermore, the trial court made a clear finding based on its knowledge of counsel's actions at trial that defense counsel acted not only competently, but impressively. See *Moore*, 207 Ill. 2d at 79, 797 N.E.2d at 638. Thus, even without interviewing defense counsel at the hearing on defendant's posttrial motion, the trial court still had a reasonable factual basis upon which to make its decision; since we, as a court of appeal, lack the ability to observe and judge the efficacy of counsel's trial performance, we cannot say that the trial court's decision on this matter was manifestly erroneous.

However, defendant's second claim with respect to his posttrial motion, that his trial counsel disregarded and overrode his desire for a bench trial, is less clear-cut. Under the Illinois constitution, an accused has the right to waive trial by jury. *People ex rel. Daley v. Joyce*, 126 Ill. 2d 209, 222, 533 N.E.2d 873, 879 (1988). It is the defendant's prerogative to decide whether or not to exercise this right of waiver (*Ramey*, 152 Ill. 2d at 54, 604 N.E.2d at 281 (1992)), and failure to accept defendant's waiver of a jury trial is generally considered reversible error.

*People v. Reed*, 23 Ill. App. 3d 546, 547, 319 N.E.2d 557, 558 (1974). Therefore, the prerogative to choose a bench trial over a jury trial belongs to the defendant and not to his counsel.

As noted, the trial court's examination of defendant upon this point was cursory, consisting of only one question. The trial court's sole question to defendant was, "You also indicate that, Number 3, you indicated that you wanted a bench trial, but, however, your attorney wanted a jury trial; is that correct?" to which defendant responded in the affirmative. The court made no effort to ask defendant to provide further details or question trial counsel to ascertain whether this allegation was a credible one. Nor did the court indicate that it had any basis upon which to deny the claim other than the court's statement that the error was harmless because its finding at a bench trial would be no different than the finding of the jury.

Correspondingly, the State contends that no prejudice could have occurred to defendant from the fact that he received a jury trial rather than a bench trial, because the trial court stated that it would have found defendant guilty if he had proceeded to a bench trial. The State's reliance on this statement – as well as the trial court's apparent reliance – is misplaced. For ineffective assistance claims under *Strickland*, prejudice is presumed if there is a reasonable probability that the defendant would have waived a jury trial in the absence of the alleged error. *Cf. People v. Todd*, 178 Ill. 2d 297, 318, 687 N.E.2d 998, 1007 (1997) (when defendant claims that counsel's error caused him to waive his right to a jury trial, prejudice under *Strickland* occurs when " 'there exists a reasonable likelihood that the defendant would not have waived his jury right in the absence of the alleged error' "), quoting *People v. Maxwell*, 148 Ill. 2d 116, 592 N.E.2d 960 (1992). This presumption of prejudice stems from the fact that the denial of one's

right to a bench trial is a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," and such structural defects cannot be subjected to a harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 310, 113 L. Ed. 2d 302, 331, 111 S. Ct. 1246, 1265 (1991); *cf. Sullivan v. Louisiana*, 508 U.S. 275, 279, 124 L. Ed. 2d 182, 189, 113 S. Ct. 2078, 2081-82 (1993) (finding harmless error analysis to be inappropriate in a case where the jury was mis-instructed about the reasonable doubt standard, because "to hypothesize a guilty verdict that was never in fact rendered – no matter how inescapable the findings to support that verdict might be – would violate the jury-trial guarantee"); *Rose v. Clark*, 478 U.S. 570, 578, 92 L. Ed. 2d 460, 471, 106 S. Ct. 3101, 3106 (1986) (stating that when a defendant's right to a jury trial is denied, "the State cannot contend that the deprivation was harmless because the evidence established the defendant's guilt; the error in such a case is that the wrong entity judged the defendant guilty"). Rather, such fundamental structural defects cast doubt on the legitimacy of the entire proceeding and demand an automatic reversal. *Fulminante*, 499 U.S. at 310, 113 L. Ed. 2d at 331, 111 S. Ct. at 1265; *Sullivan*, 508 U.S. at 279, 124 L. Ed. 2d at 189, 113 S. Ct. at 2081-82. Thus, the fact that the outcome of the case might have been the same if defendant had received a bench trial is not relevant to the question of prejudice under *Strickland*.

As noted, the trial judge's only response to defendant's contention that his attorney deprived him of a right to a bench trial was that such denial would constitute harmless error, since the bench trial finding would not have differed from that of the jury. In light of that erroneous response, we remand this matter to permit the court to clarify whether, and if so, on

what basis it may have implicitly found that the defendant's claim was otherwise spurious, so as to obviate the need for any further inquiry. *Moore*, 207 Ill. 2d at 79, 797 N.E.2d at 638 (in determining whether further inquiry is required, the court may draw upon its observation of defense counsel's performance and the adequacy of defendant's allegations on their face); see *Woodson*, 220 Ill. App. 3d at 877, 581 N.E.2d at 329. If the court does not find that the claim is otherwise spurious on its face, the court shall then make further preliminary inquiry under *Krankel* and *Moore* into defendant's claim that he was denied the right to a bench trial. In that regard, we emphasize that we are not necessarily mandating that defendant be appointed new counsel on the motion. See *Moore*, 207 Ill. 2d at 81, 797 N.E.2d at 640-41 (proper remedy for failure to conduct preliminary *Krankel* inquiry is to remand for the purposes of conducting such inquiry). If the court finds that counsel was ineffective with respect to defendant's right to a bench trial, then defendant shall be entitled to a new trial on the merits. If, however, the court finds that defendant's claim that he was denied the right to a bench trial is spurious, in that it does not establish a colorable claim of ineffective assistance of counsel, then the judgment of conviction and sentence shall be affirmed.

Remanded with directions.

McBRIDE, P.J., and O'MALLEY, J., concur.

No. 1-06-0058

| | REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT<br>(Front Sheet to be Attached to Each Case) |
|---|---|
| Please use the following form | People of the State of Illinois,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>Jamie McCarter,<br><br>Defendant-Appellant. |
| Docket No.<br><br>COURT<br><br><br><br>Opinion Filed | No. <u>1-06-0058</u><br><br>Appellate Court of Illinois<br>First District, <u>SIXTH</u> Division<br><br><u>June 6, 2008</u><br>(Give month, day and year) |
| JUSTICES | JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT:<br><br><u>McBride, P.J., and O'Malley, J.</u>, concur. |
| APPEAL from the Circuit Court of Cook County; the Hon____ Judge Presiding. | Lower Court and Trial Judge(s) in form indicated in margin:<br><br>Appeal from the Circuit Court of Cook County.<br><br>The Hon. <u>Christopher J. Donnelly</u> Judge Presiding. |
| APPELLANTS:<br>John Doe, of Chicago | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.<br><br><u>APPELLANT: Michael J. Pelletier, Deputy Defender; Brian Carroll, Assistant Appellate Defender, Office of the State Appellate Defender, 203 North LaSalle Street, 24th Floor, Chicago, IL 60601</u> |
| For APPELLEES, Smith and Smith of Chicago | <u>APPELLEES: Richard A. Devine, State's Attorney, County of Cook, Room 309 – Richard J. Daley Center, Chicago, IL 60602; James E. Fitzgerald, Samuel Shim, Christina M. Brewer, Assistant State's Attorneys</u> |
| Add attorneys for 3rd party appellants and/or appellees. | |