THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GERARDO MADRID, Defendant-Appellant.

First District (4th Division)   No. 1—08—0324

Opinion filed October 8, 2009.

Michael J. Pelletier and John Koltse, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg, Amy Watroba Kern, and Jennifer N. Bruzan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

Defendant, Gerardo Madrid, appeals his conviction for attempted first-degree murder and aggravated domestic battery and his sentence of 30 years' imprisonment for attempted first-degree murder and a concurrent 14 years' imprisonment for aggravated domestic battery. Defendant contends that the circuit court violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) by failing to ask the potential jurors during *voir dire* whether they understood and accepted the principles set forth in *People v. Zehr*, 103 Ill. 2d 472 (1984). We reverse and remand for a new trial.

We adopt the State's statement of facts verbatim:

"On May 17, 2004, Patricia Hernandez lived with her daughter Alejandra and her husband (defendant). They stayed in the attic at 2703 S. Keeler in Chicago. The home was owned by Patricia's sister Bertha and her brother-in-law Javier Vargas. Bertha and Javier stayed on the second floor of the home with their two children Fabian and Vanessa. An unrelated tenant, Henry Weber, rented the first floor. In addition to being a two-flat, 2703 S. Keeler consists of an unattached garage in back towards the alley. There is a yard between the house and garage.

Patricia Hernandez moved to Chicago from Los Angeles in April 2004 with Alejandra. She was trying to get away from defendant, so she never told him she was moving. Defendant followed her a couple of days later and, when he arrived in Chicago, Patricia agreed to give him another chance.

On May 17, 2004, defendant, Patricia, and Alejandra drove around all day looking for a job for defendant. When they stopped for lunch, defendant ate but refused to allow Patricia to eat. All day they argued. Later that afternoon they returned to 2703 S. Keeler, and defendant and Patricia sat in the garage. During this time, defendant sat in the van drinking beer and Patricia sat in a chair not drinking. They continued to argue. While in the garage, defendant pulled out the knife he always carried and held the blade in his hand. Patricia told him to calm down, and he put the knife away. At approximately 6 p.m., defendant left 2703 S. Keeler in his van.

Patricia next heard from defendant at 11 p.m. that night when he called her to open the downstairs door to let him into the apartment. At the time, Patricia, Alejandra, Javier, Fabian, and Vanessa were home. When Patricia went downstairs she saw defendant in the garage. Defendant told Patricia to get inside the van. Patricia refused because she knew he wanted to harm her, and she started to run back towards the house from the garage. Defendant ran after her and grabbed at her shoulder, hair, clothing, and necklace. He managed to break her necklace. When Patricia approached the house door, the first floor tenant, Henry Weber, stepped outside and called Javier. While this was going on, Alejandra went into Javier's bedroom and told Javier that her parents were arguing in the yard. Javier went out on the back porch to verify that Patricia and defendant were arguing. Javier then went downstairs and told Patricia to go upstairs, and defendant tried to prevent her from doing so by grabbing her shoulder. Javier told defendant to close the garage door, and defendant complied. Patricia was then able to go upstairs. Javier followed.

When Patricia headed upstairs, she went to the attic to protect her daughter. Patricia took Alejandra to the living room on the second floor. Defendant then entered the living room, grabbed six-year-old Alejandra's hands, bent down to her level, and told her to behave herself because she is not going to have a mother anymore. Alejandra then went into her cousin Vanessa's bedroom, and Javier Vargas, not having heard what defendant said to Alejandra, went back into his bedroom.

Defendant and Patricia went into the kitchen, and defendant spoke with a raised voice. At this point, Javier went into the kitchen and told defendant two or three times to go to sleep and to speak to Patricia in the morning. Javier told defendant that if he failed to comply Javier would call the police. Javier woke up his son, Fabian, and told him to call the police. Defendant laughed at Javier and mocked, 'Javier, when are you calling the police?' At that point, Javier turned to leave the kitchen. As he turned, defendant grabbed Patricia by her hair, put his arm around her neck and simultaneously pulled his knife from his pocket. Defendant took the knife and cut Patricia across her face on her left lower cheek and lower jaw going towards her neck. Defendant then threw Patricia to the ground so that she was lying on her back. Defendant pinned Patricia down by pressing his knee on her right shoulder. Defendant then stabbed her with the knife in the face, chest, mid-stomach, and arm. During this time Patricia shouted for help. She also tried to defend herself by covering herself with her hands. As a result, Patricia's hands received multiple cuts. As Patricia unsuccessfully tried to push defendant off her, she also tried to protect her neck

by hunching her shoulders and putting her chin down to her chest. While Patricia was pinned down, Javier shouted at defendant to let Patricia loose. In response, defendant stabbed Patricia one or two more times. Javier then took a kitchen chair and hit defendant one time in the back. The force was not hard enough for the chair to break, but it allowed Patricia to get loose, run into the bathroom, and lock the door.

Defendant told Javier to stay out of his relationship or he would kill Javier and Javier's son. Javier then used the chair as a shield to keep defendant away from Javier and his son. Defendant then turned the knife towards himself and stabbed himself two times. Javier used the chair to edge defendant out of the apartment. Defendant left the apartment through the back door and ran towards the alley. Javier told Fabian to call 911, and Javier went downstairs to lock the door and flag down a police car for help.

While in the bathroom, Patricia noticed that her face was cut, her shoulder hurt, and her stomach burned. Patricia stayed in the bathroom for approximately two minutes and, after briefly talking to her daughter, she sat on the living room couch. Chicago Police Officer Robert Munoz responded after receiving a dispatch call. When he arrived he was met by Javier Vargas. Officer Munoz, who is fluent in Spanish, spoke with Javier [and] then proceeded through the alley to the garage to look for defendant. Defendant was not in the garage, so Officer Munoz searched the alley and radioed for extra cars to look for defendant. Officer Munoz then entered the apartment and saw Patricia Hernandez on the couch holding a towel to her face and covered in blood. Officer Munoz also noticed the kitchen in disarray and blood in the kitchen and bathroom. He did not see a broken chair. Officer Munoz waited with Patricia until the paramedics arrived.

The paramedics took Patricia Hernandez to Mt. Sinai Hospital where she had surgery for her stab wounds: one in [the] abdomen, one to the back of her left arm, one to her center chest area, two facial wounds to [the] left side of [her] face with one extending from the left side of her nose to her ear and the other extending from the mid cheek down to the lower left jaw. During surgery, a horizontal incision was made in Patricia's abdomen from the belly button area up to the lower rib cage to check for internal injuries. It was discovered that she had a puncture to her right lung. Patricia also had a dislocated right shoulder. Patricia stayed in the hospital for three days, and had subsequent surgeries to reduce the facial scarring. Besides all the distinctive scars on her body, including her face, she lost feeling on parts of her face, including part of her mouth.

While Patricia Hernandez was in the hospital, defendant never called or visited to check on her well-being. Instead he fled to Los Angeles.

On May 21, 2004, Officer Albert Saavedra was on duty at the Los Angeles County Sheriff's Department. He had a flyer on him with defendant's name and picture. While patrolling in his squad car, he saw defendant on a bike and recognized him from the flyer. Officer Saavedra pulled his car in front of defendant, and defendant got off the bike. As Officer Saavedra's partner patted defendant down, the partner recovered a folded knife from defendant's pocket and gave it to Officer Saavedra. The knife had red stains on it which resembled blood, and was later found to match Patricia's blood. Officer Saavedra asked defendant his name, and defendant gave a false name. When Officer Saavedra inquired whether defendant's name was Gerardo Madrid, defendant asked how Officer Saavedra knew his name.

Defendant was arrested, and on the drive to the Los Angeles police station he began to cry. Officer Saavedra checked on defendant's welfare by asking whether he was all right. Instead of answering the question, defendant made a statement: 'She drove me to do it. I could not help it. And she deserve[d] what I did to her.' Officer Saavedra refrained from asking any further questions. Upon arrival at the Los Angeles police station, defendant was given his *Miranda* rights and interviewed by Los Angeles Police Officers Trujillo and Saavedra. This interview was videotaped and played at trial during the People's cross-examination of defendant to impeach defendant's testimony that he was defending himself against Javier Vargas when he stabbed Patricia Hernandez multiple times. During the People's rebuttal, the videotaped statement was admitted into evidence.

During the videotaped interview, defendant admitted to being arrested in Los Angeles for domestic battery about a year before Patricia Hernandez moved to Chicago. When Patricia left for Chicago with Alejandra, defendant felt that she abandoned him and told her over the phone that it was a crime to leave him and move to Chicago. Defendant decided to drive to Chicago to reconcile with Patricia, and when he arrived she informed him that their relationship was over. Defendant decided to sleep in his truck in front of 2703 S. Keeler despite being warned by Javier Vargas of the dangerousness of the neighborhood. The next morning, Patricia allowed defendant to stay in the apartment. He was not sure if they reconciled.

In his videotaped statement, defendant further said that on the night he stabbed Patricia, he had consumed a twelve pack of beer, but was still aware of himself. What started the incident was

defendant's demand for Patricia and him to go to sleep. Defendant said that the 'other man' there told defendant to 'get out of here.' Defendant again insisted that Patricia and him go to sleep, and the 'other man' said 'stuff' to defendant. During this time, Patricia kept 'bringing [defendant] down' and humiliating him, so defendant 'lost control.' At this point three men were there: Javier Vargas, Fabian Vargas, and another man. Defendant then said 'he got a chair,' without specifying who 'he' is, and in response defendant pulled out his knife. At this time Patricia came at defendant, and fell on the knife. This caused the wound to Patricia's stomach. After falling on the knife, Patricia came after defendant again and fell on the knife a second time. This caused the wound to Patricia's neck. Also, when Patricia came after defendant either the first or second time, 'they' went after defendant with the chair. At some point, defendant was forced into a chair and 'cut,' but he did not know who 'cut' him or forced him into the chair. Defendant then left running and went into 'hiding.' He left for Los Angeles because he wanted to obtain the report from the previous domestic violence charge. Defendant also knew he had to get out of Chicago because the police were looking for him to arrest him and put him in jail. Defendant further needed to obtain some money in order to hire an attorney to help him with this situation. Defendant admitted that he never called the police to report his wife's injuries.

Also during the videotaped statement, defendant admitted that he lied to the arresting officer as to his name. Defendant also said that he left the knife used to stab Patricia in the apartment. Defendant stated he bought the knife found on him in Los Angeles. Defendant repeatedly said throughout his statement that if he wanted to kill Patricia, she would be dead. Defendant also stated that if he wanted to kill Patricia there were plenty of other opportunities, and he would have killed her away from others.

At trial, defendant testified that in April 2004 Patricia Hernandez and Alejandra left Los Angeles to move to Chicago. Three or four days later defendant left for Chicago. When defendant arrived, he stayed at 2703 S. Keeler with Patricia and Alejandra. On May 17, 2004, defendant drove around with Patricia and Alejandra to look for a job. In the evening, defendant dropped Patricia and Alejandra off at 2703 S. Keeler and left. Defendant returned at 11 p.m., and after he parked his truck he went upstairs to the attic. When defendant saw that his wife and daughter were not in the attic, he went downstairs to the kitchen. Both Javier Vargas and Patricia were in the kitchen. Javier looked angry. Defendant told Patricia to go to sleep and she told defendant to leave. Defendant went to smoke in the backyard before returning to the kitchen. Defendant again told Patricia to go to sleep and she did not answer.

At this point, Javier hit defendant with a chair, and the chair broke into pieces. Defendant fell down and Javier rushed towards defendant, so defendant pulled his knife out of his pocket. Patricia then fell on top of defendant and he saw the knife go into Patricia. Both Patricia and defendant got up, and Javier began to hit defendant with a piece of wood. Defendant covered his head with his left arm, and swung his right arm around. Defendant's right arm held the knife. Both Patricia and Javier were in front of defendant as he swung his arm with the knife. Javier threw Patricia to the floor, and she fell on her right shoulder. At this point, Javier called for Javier's son to bring him his pistol. Defendant then stabbed himself. Defendant left the apartment and wandered around outside with the knife in his hand until he took a train to California. Defendant never got rid of the knife.

During cross-examination, defendant admitted that he was drunk and snorted cocaine on May 17, 2004. Defendant denied telling the Los Angeles detectives in his videotaped statement that Patricia Hernandez humiliated him in the kitchen. Defendant further denied stating in his videotaped statement that Patricia tried to hurt defendant. Defendant also denied telling the Los Angeles detectives in the videotaped statement that Patricia fell on the knife twice. Defendant admitted during cross-examination that Patricia's face was not disfigured before May 17, 2004, and that his knife slashed her face. Defendant further admitted that he never called the police or an ambulance for Patricia nor did he ever visit her in the hospital. He also admitted that he lied to the Los Angeles detectives about the knife found on him, and that he gave a false name when first stopped by Officer Saavedra.

At trial it was stipulated that defendant received *Miranda* warnings before he was interviewed by the Los Angeles police officers and that proper custodial procedures were followed in sending the knife from Los Angeles to Chicago. The knife, videotaped statement, and signed *Miranda* waiver form were admitted into evidence."

At the conclusion of trial, the circuit court instructed the jury as to the presumption of innocence, the State's burden of proof, and defendant was not required to prove his innocence. The jury convicted defendant of the attempted first-degree murder and aggravated domestic battery of Patricia Hernandez. Defendant filed this timely appeal.

Defendant contends the circuit court violated Rule 431(b) when it failed to ask the potential jurors during *voir dire* whether they understood and accepted the principles set forth in *Zehr*. Where an issue concerns compliance with a supreme court rule, review is *de novo*. *People v. Graham*, 393 Ill. App. 3d 268, 270 (2009).

The State contends defendant waived review by failing to raise an objection at trial (*People v. Enoch*, 122 Ill. 2d 176, 186 (1988)); however, we address defendant's argument under the plain error exception to the waiver rule as the claimed error is of such a magnitude as to deny him a fair and impartial trial. 134 Ill. 2d R. 615(a); *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

In support of his argument, defendant cites *People v. Zehr*, 103 Ill. 2d 472 (1984). In *Zehr*, our supreme court held a trial court erred during *voir dire* by refusing defense counsel's request to ask questions about the State's burden of proof, the defendant's right not to testify, and the presumption of innocence. *Zehr*, 103 Ill. 2d at 476-78. The supreme court held:

> "[E]ssential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him." *Zehr*, 103 Ill. 2d at 477.

To ensure compliance with *Zehr*, the supreme court amended Rule 431(b) in 1997 to provide: "[i]f requested by the defendant," the court shall ask the prospective jurors whether they understand and accept the *Zehr* principles. 177 Ill. 2d R. 431(b). The rule sought "to end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." 177 Ill. 2d R. 431, Committee Comments, at lxxix. The appellate court held Rule 431(b) as amended in 1997 "does not require the judge to ask the questions unless defendant's counsel has asked the court to do so." *People v. Williams*, 368 Ill. App. 3d 616, 623 (2006); see also *People v. Foreman*, 361 Ill. App. 3d 136 (2005).

Effective May 1, 2007, the supreme court again amended Rule 431(b), deleting the language "[i]f requested by the defendant," and leaving the remainder of the rule unchanged. Rule 431(b) now reads in pertinent part:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

Thus, Rule 431(b), as amended effective May 1, 2007, currently imposes a *sua sponte* duty on the circuit court to question each potential juror as to whether he understands and accepts the *Zehr* principles. Such questioning of the potential jurors is no longer dependent upon a request by defense counsel.

The defendant's trial took place after the effective date of the 2007 amendments. Therefore, the 2007 amended version of Rule 431(b) is controlling.

In the present case, the circuit court commenced *voir dire* by addressing the entire venire. The court told the venire:

"Under our law, the defendant is presumed to be innocent of all the charges placed against him that I read to you.

The presumption of innocence remains with the defendant throughout every stage of the trial, and it must be kept in your mind at all times during the presentation of the evidence.

This presumption is not overcome unless from all of the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.

The defendant is not required to prove his innocence, and the defendant is not required to put on any evidence whatsoever, meaning that he doesn't have to present any evidence. Certainly, that includes he does not have to testify in this case. That simply is because when the State puts somebody on trial, it's always their burden of proving that individual guilty beyond a reasonable doubt."

The circuit court failed to ask the potential jurors, either individually or as a group, whether they understood and accepted all the *Zehr* principles as required under the 2007 amended version of Rule 431(b).

The State contends the error was harmless, as it was not a "structural error" rendering the criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. See *Washington v. Recuenco*, 548 U.S. 212, 218 n.2, 165 L. Ed. 2d 466, 474 n.2, 126 S. Ct. 2546, 2551 n.2 (2006) (defining the types of "structural errors" that require automatic reversal). The State also cites *People v. Stump*, 385 Ill. App. 3d 515, 522 (2008), in which the Fourth District Appellate Court applied a harmless error analysis to the circuit court's failure to question the prospective jurors as to whether they understood and accepted all of the *Zehr* principles as required by the 2007 amended version of Rule 431(b). The *Stump* court held the error did not affect the jury's verdict where all four *Zehr* principles were addressed to each juror at some point during *voir dire* by either the judge or defense counsel and where the evidence of the defendant's guilt was overwhelming. *Stump*, 385 Ill. App. 3d at 521-22.

However, in *People v. Anderson*, 389 Ill. App. 3d 1 (2009), the First District Appellate Court declined to follow the decision in *Stump* that a harmless error analysis applied to the circuit court's failure to question the prospective jurors as to whether they understood and accepted all the *Zehr* principles as required by the 2007 amended version of Rule 431(b). In *Anderson*, unlike in *Stump*, neither defense counsel nor the circuit court addressed each juror with all four of the *Zehr* principles during *voir dire*. *Anderson*, 389 Ill. App. 3d at 9. The *Anderson* court also noted the court in *Stump* chose to apply a harmless error analysis despite acknowledging that the " 'mandatory nature of the rule' " signified presumptive prejudicial error. *Anderson*, 389 Ill. App. 3d at 9, quoting *Stump*, 385 Ill. App. 3d at 520. The *Anderson* court concluded the circuit court's failure to fully comply with its duty under the 2007 amended version of Rule 431(b) was so serious an error, it denied defendant a substantial right and a fair trial and necessitated reversal. *Anderson*, 389 Ill. App. 3d at 9.

Most recently, in *People v. Graham*, the First District Appellate Court again considered whether the circuit court committed reversible error by failing to question the potential jurors whether they understood and accepted all four of the *Zehr* principles as required under the 2007 amended version of Rule 431(b). The *Graham* court noted the Fourth District Appellate Court's decision in *Stump* to apply a harmless error analysis, and it also noted the First District Appellate Court's decision in *Anderson* declining to apply such a harmless error analysis. The *Graham* court further noted that subsequent to *Anderson*, the supreme court issued an opinion in *People v. Glasper*, 234 Ill. 2d 173 (2009), applying a harmless error analysis to the prior 1997 version of Rule 431(b). The *Graham* court then held:

> "The decision in *Glasper* does not alter the result in this case. The [supreme] court emphasized that 'this holding is limited to the [1997] version of Rule 431(b)(4) that was in effect at the time of the instant trial, and would not necessarily apply to subsequent versions of the rule.' *Glasper*, 234 Ill. 2d at 200. Unlike the [1997] version of Rule 431(b) at issue in *Glasper*, under the [2007] version of the rule at issue in the present case, the rule's protections are now extended to all defendants, not just those who chose to invoke them. \*\*\*
>
> Our supreme court has yet to construe the 2007 version of Rule 431(b) at issue in this case. Until that time, we shall continue to follow *Anderson* and find that a trial judge's failure to comply with Rule 431(b) denies a defendant a substantial right and thus a fair trial and obviates the need to inquire into the harmfulness or the measure of prejudice to the defendant." *Graham*, 393 Ill. App. 3d at 276.

We continue to adhere to the well-reasoned decisions in *Anderson* and *Graham* and hold that the circuit court's failure to fully comply with the 2007 amended version of Rule 431(b) denied defendant a substantial right and a fair trial and obviated the need to inquire into the prejudice to defendant. Accordingly, we reverse and remand for a new trial.

We also note that in *People v. Wilmington*, 394 Ill. App. 3d 567, 572-76 (2009), a panel of the First District Appellate Court expressly followed *Anderson* and *Graham* and held that the circuit court's failure to question the prospective jurors regarding their understanding and acceptance of the defendant's right not to testify constituted plain error necessitating reversal and remandment for a new trial. In apt language, the *Wilmington* court stated:

> "[W]e return to the State's contention that substantial compliance with Rule 431(b) was sufficient. The role of the appellate court is to decide the issue before us. Should the Illinois Supreme Court decide that substantial compliance is all that Rule 431(b) requires, it has the ability to allow waiver of the rule or to create an exception. This court does not hold such power. We are also of the view that if we create an exception to compliance with Rule 431(b), the small trickle of these cases that is now occurring will turn into a cascade. We wish to avoid that result." *Wilmington*, 394 Ill. App. 3d at 575.

We agree with the *Wilmington* analysis. Accordingly, we reverse and remand for a new trial.

The evidence presented at trial was sufficient to prove defendant guilty beyond a reasonable doubt. Therefore, double jeopardy does not bar a retrial.

As a result of our disposition of this case, we need not address the other arguments on appeal.

We empathize with the many capable trial judges who struggle, as we do, with the practical application of Rule 431(b) and hope this decision does not add to that struggle.

Reversed and remanded.

O'MARA FROSSARD, P.J., and GALLAGHER, J., concur.